No. 24-6576

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

JEFFREY POWERS, et al.,

Plaintiffs-Appellees,

v.

DENIS RICHARD McDONOUGH, et al.,

Defendants-Appellants

———————————

On Appeal from the United States District Court
for the Central District of California

———————————

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
FOR A STAY PENDING APPEAL BY NOVEMBER 12 AND AN
IMMEDIATE ADMINISTRATIVE STAY BY NOVEMBER 12**

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

E. MARTIN ESTRADA
*United States Attorney*

CHARLES W. SCARBOROUGH
DANIEL WINIK
AMANDA L. MUNDELL
*Attorneys, Appellate Staff
Civil Division, Room 7252
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-3469*

## INTRODUCTION

The mission of the Department of Veterans Affairs (VA) is "'[t]o fulfill President Lincoln's promise to care for those who have served in our nation's military and for their families, caregivers, and survivors.'"[1]  Together with other agencies, including the Department of Housing and Urban Development (HUD), VA pursues that duty zealously, including as to the plaintiffs: homeless Veterans in Los Angeles County who suffer from serious mental illnesses or traumatic brain injuries.  Thanks partly to VA's efforts, the number of homeless Veterans in Los Angeles declined by nearly a quarter between 2023 and 2024.  A6322-A6324.  VA will not rest until every Veteran has a safe and stable home.

But the district court's sprawling injunction upends VA's carefully considered judgment about how to pursue that goal.  VA has worked with stakeholders to produce a Master Plan for its West LA Campus that reflects VA's judgment not just about the appropriate amount of on-Campus supportive housing but about the best way to provide housing and services across the region to Veterans with widely varying needs, including other Veterans with disabilities.  By ordering VA to construct extensive additional on-Campus housing, the district court forced it to shift its focus away from a

---

[1] News Release, VA, New VA Mission Statement Recognizes Sacred Commitment to All Veterans, Their Families, Caregivers and Survivors (Mar. 17, 2023), https://perma.cc/N4QW-8WE6.

balanced housing strategy and toward the provision of housing in one location for Veterans with particular needs.

The injunction will undermine VA's ability to serve the plaintiff class and other Veterans, and it rests on a profoundly incorrect understanding of the district court's legal authorities and the constraints on its jurisdiction and equitable powers. This Court is likely to reverse, just as it reversed an equally expansive injunction issued by the same district court, *see LA All. for Human Rights v. County of Los Angeles*, 14 F.4th 947, 952 (9th Cir. 2021). As in that case, no one doubts the gravity of the concerns animating the district court. But as in that case, the district court went awry in attempting to impose its own judgment about how to address those concerns. No one is more committed than VA to addressing the needs of Veterans with disabilities, including plaintiffs, in a manner consistent with its resources, authorities, and obligations to Veterans across the country.

Because the government is likely to succeed on appeal, and the equities weigh heavily in the government's favor, this Court should stay the judgment pending appeal. And because VA faces an imminent and legally groundless requirement to enter contracts that would commit it to expend significant funds, the Court should grant an immediate administrative stay, no later than November 12, to allow orderly briefing and adjudication of this motion.

## STATEMENT

### A.    The West LA Campus

In 1887, Congress directed the creation of a branch of the National Home for Disabled Volunteer Soldiers "at the 'most desirable and advantageous' location 'west of the Rocky Mountains.'" *Powers v. McDonough*, 2024 WL 4100866, at *2 (C.D. Cal. Sept. 6, 2024) (amended Oct. 11, 2024).  The following year, the government accepted a gift of 300 acres between Santa Monica and Los Angeles for that purpose.  *Id.*  It quickly built housing for disabled Veterans on the site.  *Id.*  After World War II, the site—known as the West LA Campus—became home to VA's West LA Hospital, "the centerpiece of" its "Greater Los Angeles healthcare system."  *Id.* at *3.  After the war, however, use of the Campus for Veteran housing declined.  *Id.* at *4.

### B.    *Valentini*

In 2011, Veterans with disabilities sued VA.  *Valentini v. Shinseki* (*Valentini I*), 860 F. Supp. 2d 1079, 1084 (C.D. Cal. 2012).  They invoked the Rehabilitation Act's provision that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from … participation in, be denied the benefits of, or be subjected to discrimination under … any program or activity conducted by" the government.  29 U.S.C. § 794(a).  The plaintiffs contended that they were denied meaningful access to healthcare benefits because of their disabilities.  *Valentini I*, 860 F. Supp. 2d at 1087.  They also argued that the 1888 deed "created a charitable trust" benefiting "disabled veterans" that the government breached that trust by authorizing uses of the

- 3 -

land that did "not directly contribute to the operation of a home for disabled veterans." *Id.*

The district court dismissed the charitable-trust claims, concluding that the government had not "accept[ed] fiduciary duties." *Valentini I*, 860 F. Supp. 2d at 1105-1106. The court also held that the Veterans Judicial Review Act (VJRA), 38 U.S.C. § 511(a), as interpreted in *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013 (9th Cir. 2012) (en banc), barred jurisdiction over the plaintiffs' meaningful-access claim. *Valentini v. Shinseki* (*Valentini II*), 2012 WL 12882704, at *4 (C.D. Cal. June 19, 2012).

The parties settled during appeal, committing to "work together in good faith" on "a New Master Plan for VA's West LA campus." A6325.

## C. Post-*Valentini* Developments

Consistent with the settlement, VA issued a Draft Master Plan for the Campus in 2016, after public comment. A6328. The plan included "[a]pproximately 1,200 new permanent supportive housing units." A6336. "Permanent supportive housing is a residential housing model" that "links affordable, independent, long-term housing with access to social services" for people with mental-health and other disabilities. *Daveri Dev. Grp., LLC v. Village of Wheeling*, 934 F. Supp. 2d 987, 992 (N.D. Ill. 2013).

Congress enacted the West Los Angeles Leasing Act of 2016, Pub. L. No. 114-226, 130 Stat. 926 (Leasing Act), to "assist VA in carrying out the tenets of the draft master plan," H.R. Rep. No. 114-570, at 6 (2016). The Act authorized VA to enter

"enhanced-use lease[s] of real property" to private developers "for purposes of provid-
ing supportive housing … that principally benefit[s] veterans and their families." Leas-
ing Act § 2(a)-(b), 130 Stat. at 926. The Act thus provided for permanent supportive
housing to be constructed on the Campus not by VA but by third-party developers.
Congress later enacted the West Los Angeles VA Campus Improvement Act of 2021,
Pub. L. No. 117-18, 135 Stat. 288 (Campus Improvement Act). It authorized VA to use
"land use revenues" from Campus leases for several purposes, including to "[s]upport[]
construction, maintenance, and services at the Campus relating to temporary or perma-
nent supportive housing for homeless or at-risk veterans and their families." *Id.* § 2(a),
135 Stat. at 288.

In 2022, after further public comment, VA issued the current Master Plan.
A5666. Like the Draft Master Plan, it envisions "1,200 Enhanced Use Lease (EUL)
Perman[e]nt Supportive Housing unit[s]" on the Campus. A5685.

### D.    This Litigation

1.    After VA issued the 2022 Master Plan, several Veterans with disabilities
and the National Veterans Foundation brought this suit against VA. The operative
complaint added HUD as a defendant and added a putative class of plaintiffs: "home-
less Veterans with [serious mental illness] or [traumatic brain injury] who reside in Los
Angeles County." A402.

Three counts, two of which are relevant here, seek relief under the Rehabilitation
Act. Count 1, relying on *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), alleges that

plaintiffs are being denied healthcare benefits "in the most integrated setting appropriate to their needs." A407. Count 3 alleges that plaintiffs are being denied meaningful access to their healthcare benefits because VA has not given them on-Campus supportive housing. A408-A409. The third count involved a HUD voucher program; it is irrelevant to this motion because the district court did not enter injunctive relief on that count.

The other counts concern VA's management of the Campus, including agreements allowing private parties to use portions of the Campus. Count 4 alleges that the 1888 deed created a charitable trust and that VA has breached enforceable duties under that trust. Counts 5 and 7 are related equitable claims. Count 6 seeks relief under the Administrative Procedure Act, alleging that certain agreements for private parties to use parts of the Campus are invalid under the Leasing Act. A409-A417.

2. The government moved to dismiss, contending, as *Valentini II* had held, that the VJRA bars jurisdiction over plaintiffs' Rehabilitation Act claims. The district court denied the motion, *Powers v. McDonough*, 713 F. Supp. 3d 695 (C.D. Cal. 2023), and certified a class, *Powers v. McDonough*, 2024 WL 2307513 (C.D. Cal. May 3, 2024).

At summary judgment, the court concluded that the 1888 deed created a charitable trust and that Congress, through the Leasing Act, accepted fiduciary duties under the trust and made those duties enforceable against VA. *Powers v. McDonough*, 2024 WL 3416249, at *14-17 (C.D. Cal. July 14, 2024).

- 6 -

3.    After a four-week bench trial, the district court made factual findings and conclusions of law.  2024 WL 4100866.

As to counts 1 and 3, the district court concluded "that 1,800 additional permanent supportive housing units," beyond those contemplated by the Master Plan, "as well as 750 temporary supportive housing units to be used [while] permanent housing is constructed, is a facially reasonable modification that is necessary to ensure Defendants' compliance with the Rehabilitation Act."  2024 WL 4100866, at *24.  The court rejected the government's arguments that constructing that volume of additional housing would require fundamental alterations to its programs.  *Id.* at *22.

The court further concluded that four agreements for the use of Campus land by private parties—UCLA, Brentwood School, Bridgeland Resources, and SafetyPark—violated the Leasing Act and therefore "breach[ed] … VA's fiduciary duty."  2024 WL 4100866, at *28-29.  Beyond invalidating the agreements, the court enjoined VA "from entering into new leases with" those entities, citing what it regarded as "VA's persistent mismanagement of the" Campus and the view that "renegotiation … would be futile."  *Id.* at *41-42.

The court ordered VA to "provide 750 temporary supportive units on the" Campus within 12 to 18 months.  2024 WL 4100866, at *69.  It also ordered VA to develop a plan, within six months, "for the construction" within six years "of an additional 1,800 units of permanent supportive housing."  *Id.*  The court did not enter any injunction against HUD programs.

- 7 -

Several weeks after the post-trial opinion, the court issued an "emergency order" directing VA to identify "vendors of modular housing" that could be installed within three to four months, although the post-trial opinion specified a 12-month timeline. A189-A190. That order purported to "suspend[]" "[a]ny procurement rules applicable to VA." A190. The court then ordered VA to enter a new lease with Brentwood on terms negotiated between Brentwood and plaintiffs, while asserting the power to monitor VA's use of lease revenue. A184-A188. Most recently, the court ordered VA to "endeavor to sign procurement contracts" for temporary housing by November 12. A46.

Throughout post-trial hearings, the court has signaled its intent to superintend VA's management of the Campus on a long-term basis, at a level of minute detail. *See, e.g.*, A1009 ("Over the weekend, I've had some thoughts whether that [land] might be converted to one pickleball court."); A801 ("[T]here's no reason that I even have to hook up to sewer. I can run portable toilets in and showers in and I prefer to do that on a temporary basis and get people off the streets."). And the court has sought concessions from the holders of the invalidated leases by threatening—and in some cases imposing—severe consequences on the leaseholders. *See, e.g.*, A546 (discussing potential demolition of UCLA's baseball stadium); A1193 ("I certainly don't want to put sand in the [Brentwood] swimming pool[.]"); A198 (ordering Bridgeland to cap its oil well); A6507 (modifying the Bridgeland order).

4.    The district court entered final judgment on October 11.  A172.  The government noticed this appeal on October 25.  A30.  On October 30, the government filed a motion to stay the judgment pending appeal.

The district court denied the government's request for an administrative stay on November 7.  A6508.  "To ensure prompt compliance with the" order to endeavor to sign procurement contracts, the court "issue[d] an Order to Show Cause why Federal Defendants should not be held in contempt for failure to complete procurement contracts, returnable on November 13 at 8 a.m."  A6509.

## ARGUMENT

This Court should stay nearly all of the judgment, as well as the post-judgment order requiring the government to enter contracts for the purchase of temporary housing units by November 12, pending appeal.  And it should issue an immediate administrative stay to permit the orderly briefing and disposition of this motion.  The government does not seek a stay of the invalidation of its agreements with Brentwood, UCLA, Bridgeland, and SafetyPark, but does seek a stay of the injunction against renegotiating those agreements.

In considering a stay pending appeal, this Court examines "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

- 9 -

(4) where the public interest lies.'" *Nken v. Holder*, 556 U.S. 418, 426 (2009). "An applicant for a stay 'need not demonstrate that it is more likely than not they will win on the merits,' but rather must show 'a reasonable probability' or 'fair prospect' of success." *FTC v. Qualcomm Inc.*, 935 F.3d 752, 755 (9th Cir. 2019) (per curiam). Those factors uniformly favor a stay here.

## I.      The Government Is Likely To Prevail On The Merits

### A.      The Rehabilitation Act Does Not Require VA To Construct The Housing Ordered Here

1.      The VJRA bars jurisdiction over plaintiffs' Rehabilitation Act claims against VA. It states that VA's "Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans." 38 U.S.C. § 511(a). Such decisions are reviewable by the U.S. Court of Appeals for Veterans Claims and in turn by the Federal Circuit and Supreme Court. *Id.* §§ 7251, 7261, 7292.

In *Veterans for Common Sense*, this Court explained that the VJRA bars jurisdiction over claims "requir[ing] the district court to review 'VA decisions that relate to benefits decisions,' including 'any decision made by the Secretary in the course of making benefits determinations.'" 678 F.3d at 1025 (citation omitted). "This preclusion extends not only to cases where adjudicating veterans' claims requires the district court to determine whether VA acted properly in handling a veteran's request for benefits, but also

to those decisions that may affect such cases." *Id.* The VJRA thus barred claims challenging "delays in the [VA's] provision of mental health care and … adjudication of service-related disability benefits," *id.* at 1026, because determining whether delays were unreasonable would require "review[ing] the circumstances surrounding VA's provision of benefits to individual veterans," *id.* at 1027.

As in *Valentini II*, that holding forecloses jurisdiction over plaintiffs' Rehabilitation Act claims against VA. The court there explained that it could not determine whether supportive housing "is needed to give veterans meaningful access to their disability benefits" without "a review and analysis of individual veterans' situations." *Valentini II*, 2012 WL 12882704, at *4. It noted that "an individual veteran would … be precluded from arguing that the failure to provide him or her specifically with permanent supportive housing results in denial of meaningful access to benefits." *Id.* And *Veterans for Common Sense* teaches that "[p]laintiffs cannot avoid this jurisdictional problem by joining together and challenging the 'system.'" *Id.*

The district court's contrary reasoning is unpersuasive. The court noted that supportive housing "is not a benefit," *Powers*, 713 F. Supp. 3d at 714, but VA's determinations of what accommodations a Veteran needs to access benefits are determinations "'that relate to benefits decisions,'" *Veterans for Common Sense*, 678 F.3d at 1025, whether or not they are "benefits decisions." The district court also reasoned that the VJRA bar "applies only to issues that the agency has considered and decided." *Powers*, 713 F. Supp.

3d at 715. But plaintiffs cannot evade a statute that requires channeling claims through agency review by deciding not to participate in that process.

2. Even if the district court had jurisdiction, plaintiffs did not carry their burden under the Rehabilitation Act.

Plaintiffs' first claim rests on *Olmstead*'s holding that "unjustified institutional isolation of persons with disabilities is a form of discrimination," 527 U.S. at 600, and this Court's related conclusion that a "serious risk" of needless institutionalization or isolation is likewise prohibited, *M.R. v. Dreyfus*, 697 F.3d 706, 734 (9th Cir. 2012). Plaintiffs contend that because VA has not provided them with the on-campus housing, they (1) lack sufficient access to the healthcare services on the Campus; and (2) face a serious risk of being forced to obtain such services in hospitals and other institutions. *See* A302, A310.

Although Section 504's integration mandate can justify orders to provide supportive housing in some circumstances, they are not present on this record. The closest the district court came to concluding otherwise was its cursory statement that the lack of on-campus housing "places unhoused veterans at risk of institutionalization"—a statement that relied exclusively on testimony that unhoused Veterans may cycle into and out of jails, hospitals, and other institutions. *Powers*, 2024 WL 4100866, at *20 (citing A1849-A1850, A3428, A4241-A4244, A4249, A4319-A4321). But that testi-

mony says nothing about whether such Veterans are at a "serious risk" of institutional-ization, much less whether any such serious risk is attributable to Veterans' lack of access to VA healthcare services and on-campus housing.

Without a showing that plaintiffs face a serious risk of needless institutionaliza-tion, their integration-mandate claim fails, and their efforts to establish a residential enclave for Veterans with disabilities are in tension with the integration mandate's di-rective that they receive services in the "most integrated setting appropriate"—*i.e.*, a setting "'that enables [them] to interact with non-disabled persons to the fullest extent possible.'" *Olmstead*, 527 U.S. at 592.

The record equally fails to justify the finding that a lack of on-Campus support-ive housing deprives plaintiffs of meaningful access to healthcare, 2024 WL 4100866, at *44. The testimony on which the court based that finding does not show that plain-tiffs lack meaningful access to on-Campus healthcare from their current locations; at most it shows that Veterans can more conveniently access healthcare facilities when they live nearby. *See* A1953-A1954, A3327-A3328, A3347, A3430, A4031-A4032. The district court nowhere addressed the degree to which plaintiffs have been able to access healthcare, whether that access is meaningful, or whether supportive housing would rectify any lack of meaningful access.

3.    Even if plaintiffs had carried their burden, the district court did not mean-ingfully consider the government's defenses. As the court recognized, 2024 WL 4100866, at *21, a modification is not reasonable, and thus not required, if a defendant

shows the modification would "fundamentally alter" its programs. *See Townsend v. Quasim*, 328 F.3d 511, 519 (9th Cir. 2003) (observing that "fundamental alteration defenses must take into account financial and other logistical limitations" on a defendant). But the district court made no effort to address the government's evidence in support of that defense. The court asserted that because VA "already administer[s] the creation of housing on and near the West LA VA campus," it would not "fundament[ally] alter[] their program" to "[i]ncreas[e] the quantity and speed at which housing is provided to veterans with disabilities." 2024 WL 4100866, at *22. But the court offered no response to VA's extensive contrary evidence.

That evidence established that providing the quantity of housing required by the district court would fundamentally alter VA's programs. VA's approach, consistent with evidence-based practices, prioritizes the creation of diverse housing options suitable for Veterans' varied needs and preferences in communities throughout Greater Los Angeles. A2423-A2425; *see* A6499, A6505-A6506. It emphasizes integrating Veterans, including those with disabilities, into the broader community. A2441; *see* A6499, A6505-A6506. And on Campus, VA seeks to create a healthy residential community for formerly homeless Veterans of all backgrounds. A2429-A2432. Expending the substantial resources necessary to build the housing required by the district court would require VA to shift its focus away from Veterans who may have a range of disabilities toward housing in one location for Veterans with particular disabilities. A2424-A2425. This

fundamentally different approach would create an expectation that Veterans with serious mental illnesses or traumatic brain injuries should be housed on the Campus rather than in more integrated communities. A2424. It could thus result in increased segregation, isolation, and stigmatization of Veterans based on their disabilities. A2437-A2441.

It would also cause the Campus to become less hospitable for Veterans. VA's Deputy Medical Director explained that "a concentration of 4,000 permanent supportive housing units clustered in one area" would likely result in "an alarming number of behavioral health incidents," "frequent mental health crises," and "widespread substance abuse disorders." A2437. Such a large community would not be "safe," he testified, unless it were made "to look like an armed camp," but that would only "recreate an environment that … many veterans are trying to get away from." *Id.*

Nor did the court meaningfully address the magnitude of the costs it was imposing on VA. The Leasing Act authorizes VA to build permanent supportive housing by leasing to third-party developers, but the district court ordered VA to construct permanent supportive housing regardless of its ability to find developers willing to finance the projects. 2024 WL 4100866, at *25. The court concluded that the costs would not be "unreasonable" because they would "be spread out over [a] six-year timeline." *Id.* at *22. But the spreading-out of costs says nothing about whether those costs would require fundamental alteration of a program and thus preclude a court from ordering

- 15 -

the accommodation. As to temporary housing—which cannot be developer-financed—the district court reasoned that its $100 million cost estimate would be "not unreasonable in the light of the VA's overall annual budget of approximately $407 billion." *Id.* But given the many competing needs of Veterans (including others with disabilities), the size of VA's budget is not, without more, a basis to conclude that VA could reasonably afford this expense without fundamentally altering its programs.

**B.    The District Court Erred In Resolving The Land-Use Claims**

1.    Plaintiffs lack standing to pursue their charitable-trust claim.[2] The "general rule" is that "no private citizen can sue to enforce a charitable trust merely on the ground that he believes he is within the class to be benefited by the trust and will receive charitable or other benefits" from it. George G. Bogert et al., *Bogert's The Law of Trusts and Trustees* §§ 363, 414 Westlaw (database updated July 2024) (*Bogert's*); *see* Restatement (Third) of Trusts § 94 cmt. g Westlaw (database updated Oct. 2024); *He Depu v. Yahoo! Inc.*, 306 F. Supp. 3d 181, 189 (D.D.C. 2018) (recognizing "'the impossibility of establishing a distinct justiciable interest on the part of a member of a large and constantly shifting benefited class'"). "The misuse of property donated to charity is in essence an injury to the community as a whole," *Pinkert v. Schwab Charitable Fund*, 48 F.4th 1051, 1059 (9th Cir. 2022) (Bress, J., concurring in part and concurring in the judgment); *see*

---

[2] Because this defect is jurisdictional, this Court can (and must) consider it even though the government did not raise it below. *See, e.g., D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1035 (9th Cir. 2008).

*Bogert's* § 363, so a member of a broad beneficiary class lacks an Article III injury: His interest is not the sort of particularized "harm traditionally recognized as providing a basis for a lawsuit in American courts," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021).

2. In any event, the district court erred in concluding that the 1888 deed created a charitable trust imposing enforceable duties on the government. "A charitable trust is a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose." Restatement (Second) of Trusts § 348 (1959), Westlaw (database updated Oct. 2024). Statements of purpose that "merely …explain the motivation for a bequest" do not create a charitable trust. Restatement (Third) of Trusts § 13 cmt. d (2003), Westlaw (database updated Oct. 2024). Rather, unless a transferor "manifests an intention to impose enforceable duties on the transferee, the intention to create a trust is lacking and no trust is created." *Id.* And nothing in the 1888 deed manifests an intention to create a trust. The deed states that the donors acted "for the purpose of" establishing a "branch Home for Disabled Volunteer Soldiers." A236-A237. That is merely a "statement of purpose," not "a condition" on the gift. *Farquhar v. United States*, 1990 WL 121076, at *3 (9th Cir. Aug. 21, 1990) (unpublished table decision).

Even if the deed created a trust, any associated duties would be unenforceable against the government. Fiduciary duties enforceable against the government arise only

when a statute or regulation unambiguously assumes them and authorizes their enforcement. *Cf. Arizona v. Navajo Nation*, 599 U.S. 555, 564 (2023) (government owes enforceable duties to a Tribe only if "'it expressly accepts those responsibilities'" through "'specific rights-creating or duty-imposing' language in a treaty, statute, or regulation"). No statute or regulation does so here. The *Valentini I* court thus correctly concluded that the government had "not assumed any enforceable fiduciary obligation with respect to" any charitable trust created by the 1888 deed. 860 F. Supp. 2d at 1111.

The Leasing Act and Campus Improvement Act do not accept fiduciary obligations under the deed. They impose separate constraints on leases VA may enter on the Campus, including that "any land-sharing agreement" shall "benefit[] veterans and their families." Leasing Act § 2(c), 130 Stat. at 927. The district court concluded that this language created trust duties because it "mirror[s] the types of fiduciary duties that trustees traditionally assume." *Powers*, 2024 WL 3416249, at *17. But the obligations imposed by these statutes cannot be understood to create trust duties under the 1888 deed—a document, not referenced in either statute, that predated them by more than 125 years.

3. The remedies the district court ordered would be improper even aside from the merits. First, it was improper for the district court to bar VA "from entering into new leases with" Brentwood, Bridgeland, SafetyPark, or UCLA, 2024 WL 4100866, at *41. Because a federal court's "constitutionally prescribed role is to vindicate the

individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 72-73 (2018). Equitable principles reinforce that constitutional limit: Injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). To the extent the agreements violated the Leasing Act and injured plaintiffs, those injuries would be remedied by holding the agreements invalid and leaving VA free to renegotiate them. The district court based its injunction on the premise that "any renegotiation of" the agreements "would be futile." 2024 WL 4100866, at *42. But weeks later, the district court undercut that premise by determining that a renegotiated version of the Brentwood agreement complied with the Leasing Act. A180.

The district court's order regarding the renegotiated Brentwood agreement is also improper. It directs the government to enter a contract with a particular entity on terms to which the government has not agreed, A186, violating the government's "unrestricted power … to determine those with whom it will deal," *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). And it imposes ongoing judicial monitoring of VA's use of revenues from the Brentwood lease. A185. The district court framed the order as a "[s]ettlement." A184. But plaintiffs' claims regarding the Brentwood agreement were against VA, not Brentwood, and the court entered judgment for plaintiffs on those claims. The only proper relief would have been to void the Brentwood agreement and

allow VA to renegotiate it. The "settlement" is a groundless effort by plaintiffs and the district court to dictate the terms of the renegotiation.

For all these reasons, the government is likely to prevail on appeal.

## II.  The Equitable Factors Favor A Stay

The equitable factors weigh decisively in the government's favor, and "the balance of equities and the public interest[] merge where a government agency is a party," *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024).

### A.  VA's Programs For Veterans Would Suffer Irreparable Harms Absent A Stay

1.  The district court's order would require VA to expend significant funds during this appeal that it could not recoup if this Court reversed. First, VA would need to enter into a contract by November 12 to buy temporary housing to be installed on an emergency basis, and it would need to support those housing units once they were installed. Those units would cost more than $30 million to build and furnish, plus $7.7 million annually to operate. A10. Second, unless the Court resolved this appeal exceptionally quickly, VA would need to enter further contracts for additional units of temporary housing that the district court ordered it to install between October 2025 and April 2026. That would cost another $200 million (twice the district court's estimate, *see supra* p. 16). A10. And third, VA would need to expend funds to plan for the construction of 1800 additional units of permanent supportive housing beyond those envisioned by the Master Plan. It would need to hire project planners and managers and

begin the steps necessary to comply with the National Environmental Policy Act and National Historic Preservation Act.  A5.

Congress has not appropriated funds for these expenses.  The Leasing Act authorizes VA to construct permanent supportive housing by leasing to third-party developers, not by constructing or operating the units itself.  While § 2(a) of the Campus Improvement Act allows VA to use land-use revenues to "[s]upport[] construction, maintenance, and services at the Campus relating to temporary or permanent supportive housing for homeless or at-risk veterans and their families," 135 Stat. at 288, the amount of land-use revenues is far from sufficient to fund compliance with the court's orders.  A17.  What funds exist are almost entirely committed to other objectives.  *See, e.g.*, *id.*; A28-A29.  VA cannot reprogram other funds to pay for these expenses:  Congress appropriates funds for particular purposes, and VA cannot expend funds appropriated for one purpose to pay for another.  *See* U.S. Const art. I, § 9, cl. 7; *Sierra Club v. Trump*, 977 F. 3d 853, 878 (9th Cir. 2020).  In any event, there are not sufficient funds in other VA accounts.  VA has a $12 billion shortfall in its operating budget for Fiscal Year 2025, and the accounts VA uses to support infrastructure improvements are "operating at a significant deficit."  A5.

Even if VA could lawfully spend funds to comply with the district court's orders, moreover, doing so would require it to divert funds it would otherwise have spent on other improvements for Veterans, not just in Los Angeles but nationwide.  For example, VA must replace the Campus boiler ($66 million), which "has exceeded its expected

lifespan and does not meet current seismic and physical security requirements." A18. VA also plans to "relocat[e] a dialysis center in Loma Linda" ($15 million); "expand[] [a] spinal cord injury center in Albuquerque" ($12 million); "expand[] radiology services in Tucson" ($16 million); "construct[] a new medical supply warehouse in Phoenix" ($16 million); "[b]uild[] a new vascular hybrid operating room" ($9 million); and so on. A17; A28-A29. Diverting funds from these and other projects would "adversely affect hospital operations" and the quality of Veterans' care. A18; *see* A5.

2.     The injunctions against renegotiating the land-use agreements and requiring VA to enter an agreement negotiated between Brentwood and plaintiffs would create additional irreparable harms. The bar on renegotiation would prevent VA from obtaining funds that some counterparties have offered. *See* A196 (UCLA); A40-A41 (Brentwood). And requiring VA to contract with a particular entity, on terms VA did not negotiate, would impair the government's "unrestricted power … to determine those with whom it will deal," *Perkins*, 310 U.S. at 127.

3.     Finally, the orders would undermine VA's interest in maintaining health and safety on the Campus, including for Veterans who currently live there. As discussed, a significant increase in housing beyond what the Master Plan contemplates—including the placement of a large number of temporary housing units during this appeal—would increase the "rate[] of behavioral health issues and safety concerns" stemming from mental-health and substance-use issues. A11.

### B.     A Stay Would Not Harm Plaintiffs

On the other side of the ledger, a stay would not harm plaintiffs. There is no near-term need for additional temporary housing because current supply exceeds demand. "[O]n a typical night, VA maintains over 150 units of *vacant* available temporary housing throughout the [Greater LA] catchment area, including 45 available units on the [Campus]," and VA will soon open 32 additional units. A9. "No Veteran is turned away from temporary housing due to a lack of capacity." *Id.*

Nor would a stay jeopardize plaintiffs' access to healthcare or housing. VA already offers Veterans "free transportation to and from" on-Campus medical appointments through a variety of services. A10. And if an unsheltered Veteran needs temporary housing, VA will provide rides through Uber or Lyft "at no cost." *Id.*

## CONCLUSION

This Court should stay the district court's judgment pending appeal and enter an immediate administrative stay pending consideration of this motion.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

E. MARTIN ESTRADA
  *United States Attorney*

CHARLES W. SCARBOROUGH
DANIEL WINIK

*/s/ Amanda L. Mundell*
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff
  Civil Division, Room 7252
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-3469
  Amanda.L.Mundell@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Garamond, a proportionally spaced font, and that it complies with the type-volume limitation of Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 5592 words, according to Microsoft Word.

/s/ *Amanda L. Mundell*
Amanda L. Mundell