No. 24-6576

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

JEFFREY POWERS, et al.,

Plaintiffs-Appellees,

v.

DENIS RICHARD McDONOUGH, et al.,

Defendants-Appellants

---

On Appeal from the United States District Court
for the Central District of California

---

## BRIEF FOR APPELLANTS

---

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

E. MARTIN ESTRADA
  *United States Attorney*

CATHERINE M.A. CARROLL
  *Deputy Assistant Attorney General*

CHARLES W. SCARBOROUGH
DANIEL WINIK
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................iii

INTRODUCTION ........................................................................................... 1

STATEMENT OF JURISDICTION ....................................................... 5

STATEMENT OF ISSUES ...................................................................... 5

PERTINENT STATUTORY PROVISIONS ........................................ 6

STATEMENT OF THE CASE .................................................................. 6

    A.    The West LA Campus and Greater LA Healthcare System .........6

    B.    *Valentini* ...........................................................................................7

    C.    Post-*Valentini* Developments ............................................................8

    D.    This Litigation .................................................................................12

SUMMARY OF ARGUMENT ................................................................. 18

STANDARD OF REVIEW ...................................................................... 22

ARGUMENT ............................................................................................... 23

I.    The VJRA Bars Plaintiffs' Rehabilitation Act Claims Against VA ..... 23

II.    The District Court Erred In Certifying A Class For Plaintiffs' Claims Seeking Housing From VA ......................................................... 32

III.    The District Court Erred On The Merits Of The Rehabilitation Act Claims ............................................................................................... 36

    A.    The District Court Erred In Analyzing The *Olmstead* Claim .................................................................................................36

B.   The District Court Erred In Analyzing The Meaningful-Access Claim ......................................................................41

C.   The District Court Erred In Analyzing The Claim Related To Developers' Income Eligibility Policies ...................................44

D.   The District Court Erred In Granting Relief That Would Fundamentally Alter VA's Programs............................................47

IV.   The District Court Erred In Its Charitable-Trust Ruling...................... 53

A.   Plaintiffs Lack Standing To Assert Their Trust Claims .............53

B.   The 1888 Deed Did Not Establish A Trust Enforceable Against The Government................................................................55

V.   The District Court's Land-Use Injunctions Exceeded Its Authority........................................................................................ 63

CONCLUSION ...................................................................................... 68

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                           **Page(s)**

*Alexander v. Choate*,
    469 U.S. 287 (1985) ..................................................................................47, 48

*Arizona v. Navajo Nation*,
    599 U.S. 555 (2023) ........................................................................................60

*Broudy v. Mather*,
    460 F.3d 106 (D.C. Cir. 2006) ......................................................................27

*Burris v. Wilkie*,
    888 F.3d 1352 (Fed. Cir. 2018) .....................................................................32

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ........................................................................................64

*Camacho v. Nicholson*,
    21 Vet. App. 360 (2007) .................................................................................31

*Clark v. Skinner*,
    937 F.2d 123 (4th Cir. 1991) .........................................................................30

*County of Fresno v. Azar*,
    384 F. Supp. 3d 1164 (E.D. Cal. 2019) .........................................................64

*Cousins v. Secretary of the U.S. Department of Transportation*,
    880 F.2d 603 (1st Cir. 1989) .........................................................................30

*Doe v. Attorney General*,
    941 F.2d 780 (9th Cir. 1991) .........................................................................30

*Elgin v. Department of the Treasury*,
    567 U.S. 1 (2012) ...........................................................................................27

*Farquhar v. United States*,
    1990 WL 121076 (9th Cir. Aug. 21, 1990) .........................................56, 57, 59

*Fletcher v. City of San Diego*,
  2002 WL 31480258 (Cal. Ct. App. Nov. 7, 2002)................................57, 58, 59

*Gill v. Whitford*,
  585 U.S. 48 (2018) ................................................................................64

*He Depu v. Yahoo! Inc.*,
  950 F.3d 897 (D.C. Cir. 2020) .............................................................54

*J.L. v. Social Security Administration*,
  971 F.2d 260 (9th Cir. 1992) ..........................................................29, 30

*LA Alliance for Human Rights v. County of Los Angeles*,
  14 F.4th 947 (9th Cir. 2021) ...................................................................3
  2021 WL 1546235 (C.D. Cal. Apr. 20, 2021) ....................................3

*Lewis v. Casey*,
  518 U.S. 343 (1996) ..............................................................................43

*M.R. v. Dreyfus*,
  697 F.3d 706 (9th Cir. 2012) ...............................................................37

*Maine Medical Center v. Burwell*,
  841 F.3d 10 (1st Cir. 2016) ..................................................................65

*Mark H. v. Hamamoto*,
  620 F.3d 1090 (9th Cir. 2010) ................................................. 34, 42-43

*Metlakatla Indian Community v. Dunleavy*,
  58 F.4th 1034 (9th Cir. 2023) ..............................................................22

*Moya v. DHS*,
  975 F.3d 120 (2d Cir. 2020) .................................................................30

*Northwest Environmental Defense Center v. Bonneville Power Administration*,
  477 F.3d 668 (9th Cir. 2007) ...............................................................65

*Olmstead v. L.C. ex rel. Zimring*,
  527 U.S. 581 (1999) ............................................ 12, 34, 36, 37, 39, 48

*Owino v. CoreCivic, Inc.*,
   60 F.4th 437 (9th Cir. 2022) ...................................................................22

*Palisades General Hospital Inc. v. Leavitt*,
   426 F.3d 400 (D.C. Cir. 2005)..........................................................64, 65

*Perkins v. Lukens Steel Co.*,
   310 U.S. 113 (1940) ...............................................................................67

*Pinkert v. Schwab Charitable Fund*,
   48 F.4th 1051 (9th Cir. 2022) .................................................................54

*S.A. v. Trump*,
   363 F. Supp. 3d 1048 (N.D. Cal. 2018) ..................................................65

*Sai v. DHS*,
   149 F. Supp. 3d 99 (D.D.C. 2015) ..........................................................30

*Story v. Snyder*,
   184 F.2d 454 (D.C. Cir. 1950) ..........................................................58, 61

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ...............................................................................27

*Townsend v. Quasim*,
   328 F.3d 511 (9th Cir. 2003) ......................................................37, 48, 50

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ...............................................................................54

*Traynor v. Turnage*,
   485 U.S. 535 (1988) ...............................................................................25

*United States v. California Stem Cell Treatment Center, Inc.*,
   117 F.4th 1213 (9th Cir. 2024) ...............................................................22

*Valentini v. Shinseki*,
   860 F. Supp. 2d 1079 (C.D. Cal. 2012) .............................7, 8, 60, 62
   2012 WL 12882704 (C.D. Cal. June 19, 2012) ......................8, 24, 25
   2013 WL 12121981 (C.D. Cal. Aug. 29, 2013).................................8

*Veterans for Common Sense v. Shinseki*,
  678 F.3d 1013 (9th Cir. 2012) ....................................... 18, 23, 24, 25, 26, 27, 28

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ...................................................................................33, 36

**Statutes:**

Rehabilitation Act of 1973,
  Pub. L. No. 93-112, tit. V, § 504, 87 Stat. 355...................................................28

Rehabilitation, Comprehensive Services, and Developmental Disabilities
  Amendments of 1978, Pub. L. No. 95-602, tit. I, 92 Stat. 2955.............. 28-29
    § 119(2) .......................................................................................... 28-29, 29
    § 120........................................................................................................29

West Los Angeles Leasing Act of 2016,
  Pub. L. No. 114-226, 130 Stat. 926...................................................................9
    § 2(a) ..........................................................................................................9
    § 2(a)-(b) ...................................................................................................47
    § 2(b)(1) ......................................................................................................9
    § 2(b)(2) ......................................................................................................9
    § 2(b)(3) ....................................................................................................10
    § 2(h)(1) ...............................................................................................61, 62
    § 2(j)(1)......................................................................................................62
    § 2(j)(2)......................................................................................................62
    § 2(j)(3)......................................................................................................61

West Los Angeles VA Campus Improvement Act of 2021,
  Pub. L. No. 117-18, § (2)(a), 135 Stat. 288 .....................................................10

2 U.S.C. § 159.................................................................................................62

28 U.S.C. § 1291.................................................................................................5

28 U.S.C. § 1331.................................................................................................5

29 U.S.C. § 794(a).............................................................................................7

38 U.S.C. § 111................................................................................................35

38 U.S.C. § 111A.................................................................35

38 U.S.C. § 511(a)...............................................................23

38 U.S.C. § 7104(a).......................................................23, 31

38 U.S.C. § 7252..................................................................23

38 U.S.C. § 7292..................................................................23

38 U.S.C. § 7301(b)...............................................................6

38 U.S.C. § 8161(3).................................................................9

Cal. Mil. & Vet. Code § 987.005(h)..................................46

**Administrative Material:**

38 C.F.R. § 15.130(b)(1) .....................................................46

38 C.F.R. § 15.130(d)...........................................................37

38 C.F.R. pt. 70 ...................................................................35

89 Fed. Reg. 65769 (Aug. 13, 2024)............................... 45-46

Rev. Proc. 2024-38, 2024-43 I.R.B. 1010............................46

**Legislative Material:**

H.R. Rep. No. 114-570 (2016) ..........................................2, 9

**Other Authorities:**

Bogert et al., *Bogert's The Law of Trusts and Trustees*
    (Westlaw, updated July 2024):
        § 363 .........................................................................53
        § 411 .........................................................................53
        § 414 .........................................................................53

*Restatement (Second) of Trusts* § 95 (1959) ..........................................................60

*Restatement (Third) of Trusts* (2012),
    § 13 cmt. d.................................................................................................55
    § 94(2).........................................................................................................53
    § 94 cmt. g..................................................................................................53
    § 94 cmt. g(1)............................................................................................54

*VA Housed Nearly 48,000 Veterans Experiencing Homelessness*
    *in Fiscal Year 2024* (Oct. 24, 2024), https://perma.cc/3Z9M-36B3..............1

*WLA EUL Housing Phasing Plan & Release Parcel Schedule*
    (Nov. 7, 2024), https://perma.cc/A9KK-7CFV...........................................11

## INTRODUCTION

The Department of Veterans Affairs (VA) believes "'[n]o Veteran should experience homelessness in this nation they swore to defend.'" *VA Housed Nearly 48,000 Veterans Experiencing Homelessness in Fiscal Year 2024* (Oct. 24, 2024), https://perma.cc/3Z9M-36B3. VA regards the provision of housing to unhoused Veterans as "a top priority." *Id.* And although VA will not rest until every Veteran has a safe and stable home, VA's efforts—coordinated with the Department of Housing and Urban Development (HUD) and other federal, state, and local agencies—have achieved significant improvements. Nationally, VA housed nearly 48,000 previously unhoused Veterans in the most recent fiscal year, while in Los Angeles, the focus of this case, the population of Veterans experiencing homelessness declined by nearly a quarter between 2023 and 2024. *Id.*; *see* 1-ER-81.

Among the focal points of VA's efforts to combat Veteran homelessness in Los Angeles is its West Los Angeles (LA) Campus—a parcel of land, donated to the government in 1888, located between the present-day Westwood and Brentwood neighborhoods. In 2016, after outreach to stakeholders and the public, VA issued a Draft Master Plan envisioning the construction of 1,200 units of supportive housing on the Campus. Congress enacted

the West Los Angeles Leasing Act of 2016 to "assist VA in carrying out" the plan, H.R. Rep. No. 114-570, at 6 (2016). The Act authorized VA to lease Campus land to private developers who would construct and operate the supportive housing envisioned by the plan.

The district court, however, decided that VA's plan—implicitly ratified by Congress—was insufficient. The court ordered VA to construct an additional 1,800 units of permanent supportive housing beyond those envisioned in the plan, plus 750 temporary units, regardless of whether it could find developers willing to finance the housing. And the court asserted sweeping power to superintend VA's management of the Campus by concluding that the original 1888 deed for the Campus imposed perpetual, judicially enforceable trust obligations. In an extraordinary series of hearings after its initial order, the court made clear how intrusively it intended to manage VA's operations, opining about whether and where pickleball courts should be installed and whether certain housing units should be served by a sewer line, to name two examples of many. The court also invalidated four agreements by which VA allowed outside entities to use portions of the Campus, and enjoined VA from entering into future agreements

with those entities, only to then order VA to enter into a new agreement with one of the entities on terms that the entity had agreed upon with plaintiffs.

This is not the first time this district court has expansively construed its powers in attempting to address the problem of homelessness. The same court previously ordered Los Angeles County to place $1 billion in escrow "to address the homelessness crisis" and to offer "shelter or housing to all unhoused individuals in Skid Row within 180 days." *LA Alliance for Human Rights v. County of Los Angeles*, 14 F.4th 947, 952 (9th Cir. 2021), *vacating* 2021 WL 1546235 (C.D. Cal. Apr. 20, 2021) (Carter, J.). There, as here, "the district court determined it was compelled to act" because the relevant government entities were "'unable or unwilling'" to implement the court's preferred "'solutions'" for a "'public health and safety emergency.'" *Id.* But this Court rejected that arrogation of authority, identifying numerous legal errors.

The district court's rulings here reflect equally numerous and significant errors. First, the court lacked jurisdiction over plaintiffs' claims for housing, which rest on the theory that VA is discriminating against plaintiffs based on their disabilities in violation of the Rehabilitation Act. The Veterans Judicial Review Act (VJRA) requires that claims related to VA's provision of benefits, including claims of discrimination in the provision of

benefits, be brought through an administrative process and reviewed by specialized courts. Second, the court erred in certifying a class for those claims, which turn on plaintiffs' individual circumstances. Third, the court erred in resolving the merits of plaintiffs' discrimination claims. The record did not support the court's rulings against VA and HUD, and the remedies the court ordered were unlawful, including because they would force fundamental alterations to VA's programs and undermine VA's efforts to address Veteran homelessness. Fourth, plaintiffs lack standing to enforce the trust assertedly created by the original deed for the Campus—and even if they had standing, the deed did not impose a trust, nor did Congress provide for judicial enforcement. Finally, the district court exceeded its authority in dictating what agreements VA may and must enter for the use of Campus land.

As in the prior homelessness case, no one doubts the seriousness of the concerns that animated the district court. But as in that case, the court seriously erred by translating its concerns into a sprawling injunction. VA's Master Plan for the Campus, implicitly ratified by Congress, reflects VA's expert judgment about how to use the Campus and its other resources most productively to help Veterans. The district court's attempt to substitute its judgment for VA's would only hinder VA's efforts.

- 4 -

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331, except to the extent it lacked jurisdiction for the reasons explained below (at 23-32, 46, 53-54, 64). The district court entered final judgment on October 11, 2024. 1-ER-21–25. The government timely filed this appeal on October 25, 2024. 7-ER-1632–1634; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Whether the VJRA precludes jurisdiction over plaintiffs' Rehabilitation Act claims against VA.

2.      Whether the district court erred in certifying a class for plaintiffs' Rehabilitation Act claims seeking housing from VA.

3.      Whether the district court erred in resolving plaintiffs' Rehabilitation Act claims against VA and HUD.

4.      Whether the district court erred in concluding that the deed for the Campus imposes trust obligations enforceable in this suit.

5.      Whether the district court exceeded its authority by dictating what agreements VA may and must enter for the use of Campus land.

- 5 -

## PERTINENT STATUTORY PROVISIONS

Pertinent statutory provisions are reproduced in the addendum.

## STATEMENT OF THE CASE

### A.    The West LA Campus and Greater LA Healthcare System

In 1887, Congress directed the creation of a branch of the National
Home for Disabled Volunteer Soldiers "'west of the Rocky Mountains.'"  1-
ER-49.  The following year, the government accepted a gift of 300 acres be-
tween Santa Monica and Los Angeles for that purpose.  *Id.*  It built housing
for disabled Veterans on the site.  *Id.*

After World War II, the land—now known as the West LA Campus—
came to be used not for housing but for healthcare.  1-ER-51.  VA provides
medical care for qualifying Veterans, 38 U.S.C. § 7301(b), and the Campus is
the centerpiece of its Greater Los Angeles Healthcare System (VAGLAHS).
Today, the Campus houses a "main hospital," "research facilities," and "two
nursing homes," 13-ER-3133–3134.  The hospital provides "the bulk of the
specialty care" available to Veterans in Los Angeles and acts as "a referral
center for [other] clinics."  13-ER-2974.

Outside the Campus, VAGLAHS operates numerous other facilities
spanning five counties in Southern California.   10-ER-2258; 13-ER-3132–

3133. They include ambulatory-care centers in downtown LA and Sepulveda and eight "community-based outpatient clinics" in Los Angeles, Lancaster, Bakersfield, San Louis Obispo, Santa Barbara, and Ventura. 13-ER-3132–3133. These clinics offer primary-care and mental-health services for homeless Veterans so that they need not travel to the Campus to receive that routine care. *See* 13-ER-2973–2974; 13-ER-2981–2982.

## B.  *Valentini*

In 2011, a group of "severely disabled veterans with mental disabilities" or "brain injuries" sued VA. *Valentini v. Shinseki* (*Valentini I*), 860 F. Supp. 2d 1079, 1084 (C.D. Cal. 2012). They invoked § 504 of the Rehabilitation Act, which provides as relevant that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from … participation in, be denied the benefits of, or be subjected to discrimination … under any program or activity conducted by any Executive agency[.]"  29 U.S.C. § 794(a).  The plaintiffs contended that, because they lacked housing near the Campus, they were denied access to on-Campus healthcare benefits based on their disabilities. *Valentini I*, 860 F. Supp. 2d at 1087.  They also argued that the 1888 deed for the Campus "created a charitable trust" and that the government had breached that trust by

- 7 -

authorizing uses of the Campus that did "not directly contribute to the operation of a home for disabled veterans." *Id.* And they argued that agreements VA had made for the use of Campus land were invalid under the Administrative Procedure Act (APA). *Id.* at 1088.

The district court dismissed the charitable-trust claims, concluding that the government had not "accept[ed] fiduciary duties" with respect to the Campus. *Id.* at 1105-1106. The court also held that the VJRA barred jurisdiction over the plaintiffs' meaningful-access claim under the Rehabilitation Act. *Valentini v. Shinseki* (*Valentini II*), 2012 WL 12882704, at *4 (C.D. Cal. June 19, 2012). The court ruled for the plaintiffs on their APA claim. *Valentini v. Shinseki*, 2013 WL 12121981 (C.D. Cal. Aug. 29, 2013). The parties settled during appeal, committing to "work together in good faith," including on "a New Master Plan for" the Campus. 26-ER-6713.

### C.    Post-*Valentini* Developments

Consistent with the *Valentini* settlement, VA issued a Draft Master Plan for the Campus in 2016 after public notice and comment. 27-ER-6717. The plan provided for the construction of "[a]pproximately 1,200 new permanent supportive housing units" on the Campus. 27-ER-6725.

- 8 -

Shortly thereafter, Congress enacted the West Los Angeles Leasing Act of 2016, Pub. L. No. 114-226, 130 Stat. 926 (Leasing Act), to "assist VA in carrying out the tenets of the draft master plan," H.R. Rep. No. 114-570, at 6. The Act authorized VA to enter into "enhanced-use lease[s] of real property" with private developers "for purposes of providing supportive housing … that principally benefit[s] veterans and their families." Leasing Act § 2(a), (b)(1), 130 Stat. at 926. "Supportive housing" is defined for this purpose as "housing that engages tenants in on-site and community-based support services for veterans or their families that are at risk of homelessness or are homeless"; it includes both "[t]ransitional" and "[p]ermanent" and both "[s]ingle-room" and "[c]ongregate" housing. 38 U.S.C. § 8161(3); *see* Leasing Act § 2(b)(1), 130 Stat. at 926. The Act thus provided for on-Campus supportive housing to be constructed not by VA but by developers to whom VA leases land for that purpose.

In addition to authorizing enhanced-use leases for supportive housing, the Leasing Act authorizes VA to lease Campus land to outside parties for the provision of "services that principally benefit veterans and their families." Leasing Act § 2(b)(2), 130 Stat. at 926. It also authorizes a lease to the

- 9 -

Regents of the University of California, for its UCLA campus, under conditions specific to that lease. *Id.* § 2(b)(3), 130 Stat. at 926-927.

In 2021, Congress amended the Leasing Act, expanding the permissible uses of Campus lease revenue to include, among other things, "[s]upporting construction, maintenance, and services at the Campus relating to temporary or permanent supportive housing for homeless or at-risk veterans and their families." West Los Angeles VA Campus Improvement Act of 2021, Pub. L. No. 117-18, § (2)(a), 135 Stat. 288, 288.

In 2022, after further notice and comment, VA issued the current Master Plan. 24-ER-5974. Like the Draft Master Plan, it envisions 1,200 units of permanent supportive housing on the Campus, to be constructed and operated by private developers through enhanced-use leases. 24-ER-5993.

Progress on the supportive housing contemplated by the Master Plan has been slower than VA projected in the 2016 draft, including because of "required environmental impact studies, needed infrastructure upgrades, the need to establish a principal developer enhanced-use lease, and challenges faced by the developers in raising needed funds from public and private sources." 26-ER-6634. But VA has made extensive efforts on the Campus and elsewhere to address Veteran homelessness. VAGLAHS's

Community Engagement and Reintegration Service, with an annual budget of some $150 million, provides housing and other services "to 16,000 Veterans experiencing homelessness each year." 24-ER-5985. It includes several on-Campus housing options:

- Roughly 150 "tiny shelters" in the Care, Treatment and Rehabilitative Services (CTRS) program, "designed to provide homeless Veterans a safe and stable place to reside" and support services "throughout the process of placing them into transitional or permanent housing," 24-ER-5985; *see* 1-ER-63; 11-ER-2336–2337; 11-ER-2396–2397; 11-ER-2473;

- Roughly 150 beds in several shelters: A Bridge Home, New Directions, and Oasis, *see* 1-ER-64; 11-ER-2399; 11-ER-2480; 24-ER-5985;

- More than 200 beds in "two domiciliary buildings," which provide residential care "for veterans who have substance use disorder, mental health, or chronic homelessness challenges," 13-ER-3133–3134; *see* 1-ER-62; and

- At the time of trial, 233 units of permanent supportive housing operated by private developers, 1-ER-65; *see* 24-ER-5986.

Hundreds of additional units of permanent supportive housing are under construction on the Campus. 1-ER-65. The number of available units has risen to 307, and it will soon be 497, *see WLA EUL Housing Phasing Plan & Release Parcel Schedule* (Nov. 7, 2024), https://perma.cc/A9KK-7CFV. And outside the Campus, more than 5,000 Veterans receive HUD vouchers for affordable housing in the Greater LA area. 12-ER-2705.

### D.    This Litigation

After VA issued the 2022 Master Plan, several Veterans with disabilities and the National Veterans Foundation brought this suit against VA. The operative complaint added HUD as a defendant and added a putative class of plaintiffs: "homeless Veterans with [serious mental illness] or [traumatic brain injury] who reside in Los Angeles County." 7-ER-1610.

Three counts seek relief under the Rehabilitation Act. Counts 1 and 3 assert that plaintiffs are entitled to on-Campus supportive housing because they otherwise lack meaningful access to their healthcare benefits and because that lack of access places them at a serious risk of not receiving services "'in the most integrated setting appropriate to [their] needs,'" *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 592 (1999). 7-ER-1615-1617. Count 2 alleges that the developers to whom VA leases land, and for whose projects HUD vouchers can be used, impose income eligibility restrictions that discriminate based on disability by counting Veterans' benefits as income. 7-ER-1616.

The other counts concern agreements allowing outside entities to use portions of the Campus. Count 4 alleges that the 1888 deed created a charitable trust and that the agreements breached that trust. 7-ER-1617–1622.

- 12 -

Counts 5 and 7 are related equitable claims.  7-ER-1622–1625.  Count 6 seeks relief under the APA, alleging that certain agreements are invalid under the Leasing Act.  7-ER-1622–1623.

The government moved to dismiss, contending, as *Valentini II* had held, that the VJRA bars jurisdiction over plaintiffs' Rehabilitation Act claims.  The district court denied the motion, reasoning that the VJRA bars review of only those issues the VA Secretary has actually "considered and decided," 1-ER-236, and that federal courts are "better equipped" than VA "to adjudicate" Rehabilitation Act claims, 1-ER-237.

The court granted plaintiffs' motion for class certification, reasoning that "individualized determinations" were irrelevant to "whether Federal Defendants' policies and practices systematically deprive Plaintiffs of access to permanent supportive housing on the [Campus]."  1-ER-210.

The court granted in part plaintiffs' motion for summary judgment, while denying the government's cross-motion.  1-ER-201.  As to count 2, the court concluded that "VA's policy of contracting with developers who impose income limitations and count disability benefits as income" violates the Rehabilitation Act.  1-ER-193–194.  And as to the trust claims, the court held

that the deed created a trust and that the Leasing Act accepted fiduciary duties under the trust and made them enforceable.  1-ER-197–199.

After a four-week bench trial, the court entered factual findings and conclusions of law.  1-ER-47.  The court concluded that by not providing supportive housing on or near the Campus, VA "denies veterans with serious mental illness and traumatic brain injury meaningful access to the community-based VA healthcare, mental healthcare, and other critical supportive services they need and for which they are eligible" and "places unhoused veterans at risk of institutionalization."  1-ER-81.  The court determined that the construction of "1,800 additional permanent supportive housing units" beyond those contemplated by the Master Plan, "as well as 750 temporary supportive housing units to be used [while] permanent housing is constructed, is a facially reasonable modification that is necessary to ensure Defendants' compliance with the Rehabilitation Act."  1-ER-88.  The court rejected VA's arguments that constructing that volume of additional housing would require fundamental alterations to its programs, with virtually no analysis of VA's evidence.  1-ER-84.  To the extent the court addressed the burdens its order would impose on VA, it concluded that a $100 million price tag for temporary supportive housing was "not unreasonable in the light of

- 14 -

the VA's overall annual budget of approximately $407 billion" and that the "costs of permanent supportive housing" were "not unreasonable" because they would "be spread out over" six years. 1-ER-84–85.

Based on its prior conclusion that income restrictions on housing are discriminatory if Veterans' benefits are counted as income, the court ordered VA to ensure that "a sufficient number of housing units at the [Campus] are free from" such restrictions. 1-ER-89–90. The court opined that VA could achieve that goal by "directly fund[ing] or subsidiz[ing] permanent support-ive housing" or by "contract[ing] with developers who rely on … conven-tional financing" rather than on government programs that require income restrictions on the housing they fund. 1-ER-90. The court did not enter any injunctive relief affecting HUD.

The court concluded that four agreements for the use of Campus land by outside entities—UCLA, Brentwood School, Bridgeland Resources, and Safety Park—violated the Leasing Act and that the agreements therefore breached "VA's fiduciary duty" under the 1888 deed. 1-ER-95. The court based its invalidation of the UCLA agreement solely on a charitable-trust theory; as to the other agreements, the court also relied on the APA. 1-ER-113–117. Beyond invalidating the agreements, the court enjoined VA "from

entering into new leases with" those entities, citing what it regarded as "VA's persistent mismanagement of the" Campus and the view that "renegotiation … would be futile."  1-ER-118.

The court then held a series of additional hearings over a dozen days. It sought concessions from the holders of the invalidated land-use agreements by threatening, and in some cases imposing, severe consequences if concessions were not made.  For example, the court barred UCLA from its baseball stadium, 1-ER-45–46, and discussed the potential demolition of the stadium, 3-ER-549; mused about "put[ting] sand in the [Brentwood] swimming pool," 6-ER-1216; and ordered Bridgeland to cap its oil well with concrete, 5-ER-1087, before partially relenting, *see* 4-ER-791 (modifying the Bridgeland order); 1-ER-2–4 (allowing UCLA into the stadium through the end of the baseball season in exchange for UCLA's payment of $600,000).

The court also imposed significant new obligations on VA.  It issued an "emergency order" directing VA to identify "vendors of modular housing" that could be installed within three to four months, even though the post-trial opinion specified a 12-month timeline, and purported to "suspend[]" "[a]ny procurement rules applicable to VA" for the purchase of that housing.  1-ER-42–43.  The court ordered VA to enter into a new lease with

Brentwood on terms agreed upon by Brentwood and plaintiffs, while asserting the power to monitor VA's use of revenue from the lease. 1-ER-33–37. And the court indicated its intent to superintend VA's management of the Campus—which it repeatedly referred to as "veterans' land," *e.g.*, 4-ER-714—in minute detail. *See, e.g.*, 5-ER-1017 ("Over the weekend, I've had some thoughts whether that [land] might be converted to one pickleball court."); 4-ER-806 ("[T]here's no reason that I even have to hook up to sewer. I can run portable toilets in and showers in and I prefer to do that on a temporary basis and get people off the streets.").

After the district court entered final judgment, 1-ER-21, the government filed this appeal and sought a stay pending appeal. The district court denied the requested stay, 2-ER-260, but a motions panel of this Court unanimously granted it. The government did not seek a stay of the portion of the judgment invalidating the challenged land-use agreements, and during this appeal, VA has been working toward renegotiating those agreements to improve the benefits they offer to Veterans.

## SUMMARY OF ARGUMENT

The district court's judgment should be reversed.[1]

I.    The VJRA precludes jurisdiction over plaintiffs' Rehabilitation Act claims against VA. In *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013 (9th Cir. 2012) (en banc), the Court held that the VJRA barred a challenge to VA's allegedly systemic delays in providing healthcare and adjudicating benefits claims because determining the reasonableness of those delays would require "review[ing] the circumstances surrounding the VA's provision of benefits to individual veterans." *Id.* at 1027. That is equally true here.

II.    For closely related reasons, the district court erred in certifying a class for plaintiffs' Rehabilitation Act claims seeking housing from VA. Those claims turn on Veterans' individual circumstances—their particular disabilities, their particular healthcare needs, their particular barriers in accessing healthcare services on Campus, and what particular accommodations they would need to overcome those barriers.

---

[1] The government is not challenging the invalidation of the Brentwood, Bridgeland, and Safety Park agreements under the APA, but it is challenging the invalidation of the UCLA agreement because that ruling rested solely on a charitable-trust theory.

III.    The district court also erred on the merits in resolving plaintiffs' Rehabilitation Act claims against VA and HUD.

A.    Under *Olmstead*, public entities cannot provide services in a manner that causes unjustified institutional isolation of persons with disabilities or a serious risk of such institutionalization.  But the district court did not find, and the record does not indicate, that VA's manner of providing its healthcare services has caused any such institutionalization or risk thereof. Rather, the court appeared to believe that because VA provides certain services for Veterans, and because Veterans are likelier to be hospitalized or jailed if unhoused than if housed, it follows that VA must house them—even if the harms they suffer when unhoused are not attributable to the manner in which VA provides its healthcare services.  That is incorrect.

B.    The record is likewise insufficient to support the district court's conclusion that a lack of on-Campus supportive housing deprives plaintiffs of meaningful access to VA healthcare benefits.  The record establishes that Veterans can most easily access on-Campus services when they live on Campus, but that does not mean Veterans who live elsewhere (with or without housing) lack meaningful access to on-Campus services.  The district court did not make findings sufficient to justify that conclusion; nor did it attempt

- 19 -

to tailor the relief it entered to any plaintiffs or categories of plaintiffs who could establish particularized barriers to access.

C.    The district court further erred in concluding that the Rehabilitation Act precludes VA from leasing to developers who count disability benefits as income for purposes of determining eligibility for the housing. To the extent any developers maintain such policies after recent changes by HUD, the Treasury Department, and the State of California, the policies treat all income equally, whether it comes from disability benefits or from employment. The district court also lacked any basis to order VA to build housing itself if it cannot find developers willing to refrain from discrimination.

D.    Finally, the district court erred in summarily rejecting VA's contention that being compelled to construct extensive additional on-Campus housing would require fundamental alterations to VA's programs. It would require VA to shift finite resources away from community-wide efforts to serve Veterans, including those with a range of disabilities, and toward housing in a single location for Veterans with particular disabilities. It would create an expectation that Veterans with serious mental illnesses or traumatic brain injuries should be housed on the Campus, limiting their ability to choose among other settings appropriate to their needs. It would

undermine the goal of integrating them into the community. And it would make the Campus a less hospitable environment for Veterans with disabilities who live there. The district court dismissed these considerations without meaningfully addressing the government's evidence.

IV. The district court equally erred in holding that VA incurred enforceable trust obligations under the 1888 deed.

A. Plaintiffs lack standing to enforce the asserted trust. Individuals intended to benefit from a charitable trust generally cannot sue to enforce it. Some courts have recognized an exception where a trust is meant to benefit a group that is well defined and limited in number, but that is not true here.

B. In any event, the deed did not establish a trust enforceable against the government. The relevant language merely explains the donors' motivations; it does not impose perpetual trust duties. And even if the deed created a trust, fiduciary duties are enforceable against the government only when a statute or regulation unambiguously assumes them and authorizes judicial enforcement; that has not happened here.

V. Finally, the district court exceeded its authority by enjoining VA from entering into new agreements with the entities whose land-use agreements the court invalidated and by later ordering VA to enter into a new

agreement with one of those entities on terms agreed upon by plaintiffs and that entity.  That relief was unnecessary to remedy plaintiffs' asserted injuries and exceeded the court's authority under the APA.

## STANDARD OF REVIEW

After a bench trial, this Court "review[s] a district court's conclusions of law de novo and its findings of fact for clear error."  *United States v. California Stem Cell Treatment Ctr., Inc.*, 117 F.4th 1213, 1217 (9th Cir. 2024).  As to class certification, this Court "'review[s]" the district court's "'determination for legal error under a de novo standard'"; "'if no legal error occurred,'" the Court "'proceed[s] to review the decision for abuse of discretion.'"  *Owino v. CoreCivic, Inc.*, 60 F.4th 437, 443 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 2612 (2023).  Finally, the Court "review[s] for abuse of discretion a decision to grant or deny permanent injunctive relief, but [it] review[s] de novo the underlying legal conclusions on which the district court based its decision."  *Metlakatla Indian Cmty. v. Dunleavy*, 58 F.4th 1034, 1042 (9th Cir. 2023).

# ARGUMENT

## I.   The VJRA Bars Plaintiffs' Rehabilitation Act Claims Against VA

A.    The VJRA provides that the VA "Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans."  38 U.S.C. § 511(a).  It gives an administrative body, the Board of Veterans Appeals, jurisdiction to decide "[a]ll questions in a matter which under [§ 511(a)] is subject to decision by the Secretary."  *Id.* § 7104(a).  And it provides for review of the Board's decisions by an Article I court—the Court of Appeals for Veterans Claims, *id.* § 7252, known as the Veterans Court—whose decisions are in turn reviewable by the Federal Circuit, *id.* § 7292, and the Supreme Court.

In *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013 (9th Cir. 2012) (en banc) (*VCS*), this Court explained that the VJRA "precludes jurisdiction over a claim if it requires the district court to review 'VA decisions that relate to benefits decisions,' including 'any decision made by the Secretary in the course of making benefits determinations.'"  *Id.* at 1025 (citation omitted).  "This preclusion extends not only to cases where adjudicating veterans'

- 23 -

claims requires the district court to determine whether the VA acted properly in handling a veteran's request for benefits, but also to those decisions that may affect such cases." *Id.*

The Court's application of the VJRA bar clarified its breadth. The Court held that the VJRA precluded claims challenging systemic "delays in [VA's] provision of mental health care and … adjudication of service-related disability benefits" because determining whether those delays were unreasonable would require "review[ing] the circumstances surrounding the VA's provision of benefits to individual veterans." *Id.* at 1026-1027. The Court did not apply VJRA preclusion to separate claims challenging "VA's procedures for filing and handling benefits claims," reasoning that adjudicating those claims would not require a court "to review 'decisions' affecting the provision of benefits to any individual claimants." *Id.* at 1034.

As the district court explained in *Valentini*, *VCS* makes clear that the VJRA bars jurisdiction over plaintiffs' Rehabilitation Act claims against VA. The *Valentini* court recognized that it could not determine whether supportive housing "is needed to give veterans meaningful access to their disability benefits" without "a review and analysis of individual veterans' situations." *Valentini II*, 2012 WL 12882704, at *4. It noted that "an individual veteran

would … be precluded from arguing that the failure to provide him or her specifically with permanent supportive housing results in denial of meaningful access to benefits." *Id.* And *VCS* teaches that "[p]laintiffs cannot avoid this jurisdictional problem by joining together and challenging the 'system.'" *Id.*

B.     The district court erred in rejecting the *Valentini* court's conclusion that the VJRA bars plaintiffs' Rehabilitation Act claims against VA.

1.     The district court reasoned that the VJRA does not bar plaintiffs' claims because the housing plaintiffs seek is not "a benefit." 1-ER-235. But that is beside the point: VA's determinations of what accommodations a Veteran needs to access benefits are determinations "'that relate to benefits decisions,'" *VCS*, 678 F.3d at 1025, whether or not they are themselves "benefits decisions." Indeed, as *VCS* explains, a principal aim of the VJRA was to overrule *Traynor v. Turnage*, 485 U.S. 535 (1988), which had held that federal courts could review a claim that "VA's regulations conflicted with § 504 of the Rehabilitation Act." *VCS*, 678 F.3d at 1021. The district court's interpretation of the VJRA would allow exactly the sort of judicial review that Congress enacted the VJRA to foreclose.

2.    The district court further reasoned that the VJRA bars review of only those issues the VA Secretary has actually "considered and decided." 1-ER-236–237.  Because Veterans never asserted the need for supportive housing "at any benefits hearing or any other proceeding before the agency," the court believed, "that issue cannot be deemed 'necessary to a decision by the Secretary.'" 1-ER-236.

That reasoning conflicts with *VCS*.  This Court's rationale there was not that VA had actually decided, in individual cases, how much delay to impose.  It was that determining the delays' reasonableness would require "review[ing] the circumstances surrounding the VA's provision of benefits to individual veterans," 678 F.3d at 1027.  Plaintiffs' claims here likewise require determining whether Veterans have meaningful access to benefits and, if not, what accommodations they need.

The district court's logic would subvert the VJRA's creation of an "exclusive review mechanism," *VCS*, 678 F.3d at 1033.  Under the court's reasoning, a plaintiff could evade the VJRA's "exclusive" scheme by choosing not to participate in it; a federal court would have jurisdiction over issues the plaintiff failed to raise with VA because VA would not have "considered and decided" those issues, 1-ER-236.  But like other statutory schemes that

channel particular types of claims through specialized mechanisms of administrative and judicial review, the VJRA scheme is mandatory, not optional. *Cf. Elgin v. Department of the Treasury*, 567 U.S. 1, 11 (2012) (Civil Service Reform Act); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-209 (1994) (Federal Mine Safety and Health Amendments Act).

The district court's conclusion draws no support from the D.C. Circuit's decision in *Broudy v. Mather*, 460 F.3d 106 (D.C. Cir. 2006). The claim there was that the Department of Defense had improperly withheld information about the plaintiffs' exposure to radiation, leaving VA to make disability determinations with inaccurate or incomplete information. The D.C. Circuit held that the VJRA did not bar jurisdiction because the VA Secretary had not "made an 'actual decision' on any issues that the parties [were] asking the District Court to decide." *Id.* at 114. But that conclusion—in a case based on the allegedly unlawful withholding of information by a different agency—is inapposite here, where plaintiffs challenge VA's own determinations related to providing Veterans with healthcare. If *Broudy* meant what the district court believed, this Court would not have cited it favorably in *VCS*, 678 F.3d at 1024-1026, while reaching a conclusion inconsistent with the district court's interpretation of it.

3.     The district court also reasoned that "the Rehabilitation Act is a generally applicable anti-discrimination statute" and that "Article III courts appear to be better equipped" than VA "to adjudicate" claims under it.  1-ER-237.  That misunderstands both the VJRA and the Rehabilitation Act.

First, as discussed above, a principal aim of the VJRA was to overrule *Traynor*'s holding that federal courts could review a claim that "VA's regulations conflicted with § 504 of the Rehabilitation Act."  *VCS*, 678 F.3d at 1021.  Congress enacted the VJRA precisely to clarify that VA, not federal courts, should address in the first instance how the Rehabilitation Act affects VA programs.

Second, even outside the VJRA context, Congress envisioned that federal agencies would review Rehabilitation Act complaints against them in the first instance.  That is clear from the Rehabilitation Act's text and history.  As originally enacted, § 504 of the Act did not apply to federal programs; it was limited to "program[s] or activit[ies] receiving Federal financial assistance."  Rehabilitation Act of 1973, Pub. L. No. 93-112, tit. V, § 504, 87 Stat. 355, 394.  Congress amended it to extend to "any program or activity conducted by any Executive agency."  Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95-602, tit.

I, § 119(2), 92 Stat. 2955, 2982.  But in doing so, Congress did not create an express cause of action for § 504 violations by agencies acting in their programmatic capacities, as opposed to their capacities as providers of federal funding.  *See id.* § 120, 92 Stat. at 2982-2984 (codified at 29 U.S.C. § 794a) (creating a cause of action only for § 504 violations by "recipient[s] of Federal assistance or Federal provider[s] of such assistance").

Instead, in the provision extending § 504 to programs and activities "conducted by any Executive agency," Congress directed agencies to "promulgate such regulations as may be necessary to carry out the amendments." *Id.* § 119(2), 92 Stat. at 2982.  By doing so, Congress made clear that "agencies themselves should take primary responsibility for compliance." *J.L. v. Social Sec. Admin.*, 971 F.2d 260, 265 (9th Cir. 1992), *abrogated on other grounds by Lane v. Pena*, 518 U.S. 187 (1996).  Federal courts can review an agency's adjudication of a § 504 complaint against its programs or activities in the same manner as they review other actions by the agency.

The district court was thus incorrect to believe that Rehabilitation Act complaints against an agency are ill-suited to review by the agency in the first instance.  Requiring administrative presentation of Rehabilitation Act complaints against federal agencies, as Congress intended, does not neuter

the Act or prevent judicial review. It simply defers judicial review until the agency has had an opportunity to bring its programs into compliance or explain why it believes they are compliant.[2]

4.     Finally, the district court believed that plaintiffs' claims would fall within "a jurisdictional void" if barred by the VJRA. 1-ER-238. That is incorrect. Plaintiffs' claim that they need housing to access their benefits is effectively a claim that their benefits are presently inadequate. If a Veteran raised such a claim with VA and VA denied it, that decision would be reviewable by the Board of Veterans' Appeals—which has jurisdiction over

---

[2] Because Congress expressly provided a cause of action against recipients of federal assistance and federal agencies in their funding capacities, but not against agencies in their programmatic capacities, most courts have concluded that plaintiffs lack a private right of action to enforce § 504 against violations by an agency in its programmatic capacity. *See Moya v. DHS*, 975 F.3d 120, 128 (2d Cir. 2020); *Clark v. Skinner*, 937 F.2d 123, 125 (4th Cir. 1991); *Cousins v. Secretary of the U.S. Dep't of Transp.*, 880 F.2d 603, 605-611 (1st Cir. 1989) (en banc) (Breyer, J.); *see also, e.g.*, *Sai v. DHS*, 149 F. Supp. 3d 99, 111-115 (D.D.C. 2015). This is the only court of appeals to have reached a different conclusion, *see Doe v. Attorney General*, 941 F.2d 780, 794 (9th Cir. 1991), *abrogated on other grounds by Lane v. Pena*, 518 U.S. 187 (1996), although this Court has required that certain § 504 claims be exhausted before the agency before being brought in federal court, *see J.L.*, 971 F.2d at 265-272. In an appropriate case, this Court should reconsider its holding that § 504 implies a private right of action for claims against federal agencies in their programmatic capacities, as opposed to being enforceable through administrative proceedings with subsequent judicial review. But here, the VJRA independently precludes plaintiffs' § 504 claim.

"[a]ll questions in a matter which under [§ 511(a)] is subject to decision by the Secretary," 38 U.S.C. § 7104(a) — and in turn by the Veterans Court, the Federal Circuit, and the Supreme Court, *see supra* p. 23.

The Veterans Court's decision in *Camacho v. Nicholson*, 21 Vet. App. 360 (2007), on which the district court relied, 1-ER-239, is not to the contrary. It held that "a decision by the appellant's employer to disqualify him from driving" did not "constitute[] a 'regulation of [his] activities'" for benefits purposes because the disqualification was not "medically necessary." 21 Vet. App. at 361. The court noted that the applicant might have a Rehabilitation Act claim against his employer — which happened to be VA — but that it would "lie[] elsewhere," not in the VJRA framework. *Id.* at 366. In stating that neither it nor the Board of Veterans Appeals could hear "actions brought under" the Rehabilitation Act, *id.*, the Veterans Court was thus referring to actions against employers, not to claims that VA is violating the Rehabilitation Act in providing benefits.

The district court also erred in believing plaintiffs could not obtain appropriate relief through the VJRA scheme. If a Veteran raised through VA a claim that he needed supportive housing to access his VA benefits, VA would either provide that housing or determine that it was not authorized

or required—and if VA made the latter determination erroneously, a court reviewing its action through the VJRA framework could hold as much and remand for VA to grant the request. The Federal Circuit's decision in *Burris v. Wilkie*, 888 F.3d 1352 (Fed. Cir. 2018), is irrelevant. The holding there was that the Veterans Court cannot order VA to provide, "on equitable grounds, monetary relief" not authorized by "substantive statutory law." *Id.* at 1359. That holding hardly implies that the Veterans Court cannot require VA to comply with its statutory obligations.

In sum, the district court erred in concluding that it had jurisdiction over plaintiffs' Rehabilitation Act claims against VA. The VJRA required that plaintiffs bring those claims through VA, with judicial review in the Veterans Court and the Federal Circuit.

## II.    The District Court Erred In Certifying A Class For Plaintiffs' Claims Seeking Housing From VA

The district court similarly erred in certifying a class for plaintiffs' Rehabilitation Act claims seeking housing from VA.[3]

---

[3] The Court need not address this issue if it concludes that the VJRA bars plaintiffs' Rehabilitation Act claims against VA, since the VJRA-barred claims include all those as to which class treatment was improper.

- 32 -

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).  Among the requirements for invoking that exception is "commonality"—the requirement that "class members 'have suffered the same injury,'" not "merely … a violation of the same provision of law."  *Id.* at 349-350.  To satisfy that requirement, claims must "depend upon a common contention … of such a nature that it is capable of classwide resolution," meaning "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 350.

That requirement can be satisfied for Rehabilitation Act claims where the challenged policies, practices, or omissions affect class members in a common way.  For example, we do not dispute in this appeal that it is satisfied for plaintiffs' claim that the Rehabilitation Act bars the treatment of disability benefits as income for purposes of housing eligibility.

The commonality requirement is not satisfied, however, for plaintiffs' claims that (1) VA deprived them of meaningful access to healthcare benefits by not providing on-Campus supportive housing and (2) their lack of access to those benefits placed them at a serious risk of not receiving services in

"'the most integrated setting appropriate to [their] needs,'" *Olmstead*, 527 U.S. at 592. As discussed above, those claims turn on Veterans' individual circumstances—their particular disabilities, their particular healthcare needs, the particular locations in which they reside, the particular obstacles they face in traveling to Campus to receive care, and what particular accommodations would allow them to access on-Campus services. *See, e.g.*, *Mark H. v. Hamamoto*, 620 F.3d 1090, 1098 (9th Cir. 2010) (reasonableness of accommodation "'depends on … individual circumstances'" and requires "'fact-specific'" analysis).

That is underscored by the district court's analysis of the claims. For example, the court referred repeatedly to plaintiff Laurieann Wright, who suffers from "PTSD related to sexual assault she experienced during her military service" and from "extensive physical disabilities and medical conditions," including "osteoporosis" and "a neck injury." 1-ER-53–54; *see* 1-ER-76; 1-ER-87. Ms. Wright's challenges in obtaining on-Campus healthcare are not general to the plaintiff class; rather, they stem from the location of her current home ("approximately 65 miles away" from Campus) and from the fact that her particular physical disabilities make it "excruciating" to "sit[]" for hours in traffic or on the train" to commute that distance. 1-ER-53–54.

- 34 -

Whether Ms. Wright has meaningful access to her on-Campus benefits—and, if not, what accommodations might be reasonably necessary to give her access—turns on those individual circumstances.

By contrast, four of the other five named plaintiffs—Jeffrey Powers, Joseph Fields, Lavon Johnson, and Joshua Robert Pettit—already live on Campus. 10-ER-2247; 17-ER-4278; 17-ER-4306; 18-ER-4537. And the fifth, Deavin Sessom, resides (at least as of a year ago) in "the Brentwood neigh-borhood," 7-ER-1486, within a mile of Campus, 7-ER-1451. The analysis of whether those plaintiffs have access to on-Campus services is completely different from the analysis for Ms. Wright. And even for a plaintiff who lived as far away as Ms. Wright, the analysis would be completely different if the plaintiff did not have physical disabilities that make it hard to com-mute long distances. A plaintiff in that situation, for example, might be able to access the Campus with the help of VA's Beneficiary Travel program or Veterans Transportation Service. *See* 38 U.S.C. §§ 111, 111A; 38 C.F.R. pt. 70.

In finding the commonality requirement satisfied, the district court reasoned that "the issue of whether Federal Defendants' policies and prac-tices systematically deprive Plaintiffs of access to permanent supportive housing on the [Campus] does not require individualized determinations

- 35 -

and can be resolved on a classwide basis."  1-ER-210.  But the question here is not whether plaintiffs are "deprive[d] … of access to permanent supportive housing," *id.*  Rather, the relevant questions are whether the lack of such housing deprives plaintiffs of meaningful access to their on-Campus healthcare benefits and, by doing so, places them at a serious risk of not receiving services in "'the most integrated setting appropriate to [their] needs,'" *Olmstead*, 527 U.S. at 592.  Those questions cannot be answered "in one stroke," *Wal-Mart*, 564 U.S. at 350, because the analysis of meaningful access in this case depends in significant respects on plaintiffs' individual circumstances.

## III.  The District Court Erred On The Merits Of The Rehabilitation Act Claims

The record also did not support the district court's rulings on the merits of the Rehabilitation Act claims or the relief the court entered.

### A.  The District Court Erred In Analyzing The *Olmstead* Claim

Plaintiffs' first claim rests on *Olmstead*'s holding that "unjustified institutional isolation of persons with disabilities is a form of discrimination," 527 U.S. at 600, and this Court's holding that plaintiffs can prevail on an *Olmstead* claim by "show[ing] that the challenged state action creates a

serious risk of institutionalization," *M.R. v. Dreyfus*, 697 F.3d 706, 734 (9th Cir. 2012). Under *Olmstead*, public entities can be "required to provide community-based treatment," rather than treatment in segregated institutional settings, for persons with disabilities. 527 U.S. at 607; *see* 38 C.F.R. § 15.130(d) (requiring VA to "administer programs and activities in the most integrated setting appropriate to the needs of qualified individuals with" disabilities). In *Olmstead* itself, for example, the plaintiffs had been institutionalized for the treatment of mental-health disabilities and sought treatment in community-based settings instead. 527 U.S. at 593-594. Supportive housing can be one means of allowing persons with disabilities to receive services "'in the most integrated setting appropriate'" to their needs, *id.* at 591-592.

But *Olmstead* does not require public entities to "provide a certain level of benefits to individuals with disabilities," *Olmstead*, 527 U.S. at 603 n.14, or "to create new programs that provide heretofore unprovided services to assist disabled persons," *Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003). Rather, *Olmstead* requires that, when public entities do provide services, they do so in a manner that "avoid[s] unjustified isolation of individuals with disabilities" or a serious risk of such isolation. 527 U.S. at 597; *see Townsend*, 328 F.3d at 518 ("[E]ntities are required only to make reasonable changes in

*existing* policies in order to accommodate individuals' disabilities." (emphases added and omitted)).

Here, then, the relevant question is whether VA's administration of its healthcare services created a serious risk of any unjustified institutionalization of persons with disabilities. The district court did not find that it did, and the record would not support such a finding. Rather, the court's conclusion that VA "places unhoused veterans at risk of institutionalization," 1-ER-81, and the findings underlying that conclusion, 1-ER-129 ¶¶ 43-44; 1-ER-160 ¶ 206, rested on testimony showing that *homelessness* may place Veterans at risk of being hospitalized or jailed. The testimony showed that many "people experiencing homelessness will end up utilizing the emergency room for routine healthcare," that "they can eventually be hospitalized" for conditions that might have been prevented or better treated if they had housing, and that "[t]hey can end up in jails and prisons and treatment programs," including if their mental-health needs are inadequately treated elsewhere. 10-ER-2143–2144; *see* 15-ER-3727. Plaintiff Joseph Fields, for example, testified that during a period of housing instability he suffered a back injury while bicycling in downtown Los Angeles; that that injury led to "[o]n and off" hospitalizations; that while homeless he had "encounters with law

enforcement" who would "periodically sweep the sidewalk"; that he acquired an infection from living in an unclean environment on the streets; that he was arrested "[a] couple of times" for things like "tickets"; and that he spent "[a] little bit" of time in jail. 18-ER-4543–4546; 18-ER-4551; *see* 18-ER-4621–4623 (similar testimony from Laurieann Wright).

These are lamentable circumstances, and it is sound public policy to try to mitigate them, including by promoting greater access to housing. *See* 27-ER-6935–6939 (supportive housing is "cost effective"). That is one reason VA makes extensive efforts to provide housing options for Veterans.

But *Olmstead* does not impose a freestanding obligation for VA to address every possible reason—beyond its administration of the healthcare benefits it provides—that a Veteran could end up in a hospital or jail. Rather, *Olmstead* establishes that, when VA provides services to people with disabilities, it must do so in integrated settings rather than segregated institutions when possible. And here, the record fails to establish any connection between VA's operation of its healthcare services and a serious risk of any "unjustified isolation," *Olmstead*, 527 U.S. at 597, of plaintiffs. Even assuming Mr. Fields's hospitalizations or jail stints would constitute institutionalizations within the meaning of *Olmstead*, nothing in his testimony attributed his

hospitalizations or jail stints to any difficulty in accessing VA services on the Campus. *See* 18-ER-4543–4546; 18-ER-4551. Nor did Ms. Wright's testimony, 18-ER-4621–4623, or the other testimony on which the district court relied, 10-ER-2143–2144; 15-ER-3727, articulate such a connection.

The district court appeared to believe that because VA provides certain services for Veterans, and because Veterans are likelier to be hospitalized or jailed if unhoused than if housed, VA is required to house them—even if the harms they suffer when unhoused are unrelated to the manner in which VA provides its services. But there is no basis for that capacious reading of *Olmstead*, and it would have radical implications extending well beyond VA. If it were correct, then VA—and all other public entities that provide certain services to certain populations—might be required to expand their programs to provide any and all services that could help prevent hospitalizations or jail stints, even if they were not discriminating based on disability in the provision of their existing services. That risk could deter public entities, which face severe resource constraints, from providing certain services at all.

Moreover, it is unclear how the district court's application of *Olmstead* would serve the interests *Olmstead* protects, because Veterans with disabilities would arguably be more segregated from the broader community, not

less, if they lived together in an enclave of on-Campus supportive housing. At trial, a VA official explained that concentrating thousands of Veterans with disabilities on the Campus would be "re-institutionalizing" them—resurrecting an era when "large numbers of people liv[ed] on hospital grounds because … it let the community avoid any responsibility for them"—rather than "giving [them] an honest opportunity to live their full life, integrated into the community," by providing them with a range of housing options on the Campus and elsewhere.  12-ER-2737.

Finally, even aside from the error of the district court's judgment against VA, the court manifestly erred in entering judgment on this claim against HUD, *see* 1-ER-22–23, because HUD had nothing to do with the violations the court identified.

### B.    The District Court Erred In Analyzing The Meaningful-Access Claim

The record equally fails to justify the district court's conclusion that a lack of on-Campus supportive housing deprives plaintiffs of "meaningful access to" their VA healthcare benefits, 1-ER-81.  The findings underlying that conclusion, 1-ER-123–124 ¶¶ 17-19, rested on testimony establishing that Veterans can more easily access healthcare facilities when they live nearby.

- 41 -

For example, plaintiff Jeffrey Powers, who lives on Campus, testified that living there would make it "convenient" to access treatment there (though he is not currently receiving treatment there). 10-ER-2247–2248. Plaintiff Lavon Johnson, who likewise lives on Campus, testified that living there has made it easy for his healthcare providers to "find [him]." 17-ER-4332–4333. And Michael Dennis, a HUD employee, testified that HUD had made policy changes in view of "the need for … veterans to be close" to services. 15-ER-3646; *see* 15-ER-3626–3627; *see also* 15-ER-3729 (testimony of Dr. Jonathan Sherin that "having a stable environment where someone can … get to a clinic and return[] is fundamental to health").

But the undisputed fact that it is easier for Veterans to access on-Campus services when they live on Campus does not mean Veterans lack meaningful access to on-Campus services when they live elsewhere, with or without housing. As discussed above, the meaningful-access issues in this case turn on Veterans' individual circumstances. Laurieann Wright, who lives far from Campus and whose physical disabilities make it difficult to travel, could be understood to lack meaningful access to on-Campus services. That would be the starting point for an "'individualized'" determination of what "'accommodations … might allow'" her meaningful access. *Mark H.*, 620

F.3d at 1098.  VA contests none of this; indeed, VA's draft Master Plan for the Campus recognized that, "[d]epending on the acuity of" a particular Veteran's conditions, "the stress associated with traveling to" Campus could "be an insurmountable barrier" to treatment there.  27-ER-6724; *see* 19-ER-4794 (similar testimony from VA official).  And if Ms. Wright had submitted her Rehabilitation Act claim through the proper administrative channels, VA could have determined what if any accommodations it needed to provide.

But the district court made no attempt to limit its finding of a Rehabilitation Act violation, or the relief it entered, to any plaintiffs who might experience those sorts of individualized barriers to meaningful access.  Nor did the court make any attempt to discern what proportion of plaintiffs might lack meaningful access to Campus because of their individual circumstances, notwithstanding the transportation services that are available, *see supra* p. 35, or to determine whether that proportion was sufficiently great as to justify some sort of systemic relief.  *Cf. Lewis v. Casey*, 518 U.S. 343, 359 (1996) (propriety of "systemwide relief" for violations of incarcerated persons' constitutional rights turned on whether the violations were sufficiently "widespread").  And the court did not attempt to explain why Veterans would be "impeded in their ability to access" on-Campus healthcare simply

because they are "unhoused," 1-ER-124—a finding at odds with the court's later observation, in denying a stay pending appeal, that many unhoused Veterans have situated themselves near the Campus precisely to facilitate their access to services there, 2-ER-276.

The district court thus erred in analyzing the meaningful-access claim. On a proper understanding of what is required to substantiate a lack of meaningful access, the record did not support the district court's class-wide determination that VA is violating the Rehabilitation Act or the class-wide relief it entered. And again, even aside from the error of the district court's judgment against VA, the court erred in entering judgment on this claim against HUD, 1-ER-22–23, because HUD had nothing to do with the violations the court identified.

### C.  The District Court Erred In Analyzing The Claim Related To Developers' Income Eligibility Policies

The district court further erred in resolving plaintiffs' claim that the Rehabilitation Act precludes VA from leasing land to housing developers if the developers count disability benefits as income in determining eligibility for the housing.

1.  The district court reasoned that if Veterans' disability benefits are counted as income, then Veterans with high disability ratings, who receive correspondingly high disability benefits, are less likely to qualify as low-income than Veterans with low disability ratings, who receive correspondingly lower benefits. 1-ER-191–195. The court concluded that the income cap thus necessarily discriminates based on disability. *Id.* But there is no allegation here that developers treat Veterans who receive their income through disability benefits worse than others who receive the same income from another source, such as employment. Rather, the income eligibility restrictions in question treat all income equally, regardless of its source. The district court's rationale for concluding that Veterans who receive high disability benefits face discrimination based on disability was therefore incorrect.

Of course, there are sound public-policy reasons for Veterans to be eligible for subsidized housing even when they receive significant disability benefits. That is why, during trial, "HUD announced a policy change" to "exclude[] veterans' service-connected disability benefits when determining eligibility" for the HUD-Veterans Affairs Supportive Housing (HUD-VASH) program—a change plaintiffs had sought. 1-ER-68; *see* 89 Fed. Reg. 65769

- 45 -

(Aug. 13, 2024). And it is why, shortly after trial, the Treasury Department decided no longer to include service-connected disability benefits when determining eligibility for housing financed by the Low-Income Housing Tax Credit. Rev. Proc. 2024-38, 2024-43 I.R.B. 1010 (4-ER-945–952). In light of these changes, and a similar change in California law, *see* Cal. Mil. & Vet. Code § 987.005(h), *amended by* A.B. 535 (Cal. 2024), it is unclear whether any developers will continue to count Veterans' benefits as income when determining their eligibility for housing. And at a minimum, the changes have mooted any claim for injunctive relief against HUD.

2. Even if the district court were correct that the Rehabilitation Act bars VA from leasing to developers who count Veterans' benefits toward income eligibility caps, the court further erred in the relief it entered. Rather than simply ordering VA to refrain from leasing to such developers, the court ordered VA to build housing itself if it could not find developers willing to refrain from discrimination. 1-ER-89–90.

That remedy exceeds the scope of the Rehabilitation Act. To be sure, the Act prohibits VA from providing services by contracting with outside entities that discriminate based on disability. *See* 38 C.F.R. § 15.130(b)(1). Thus, if Congress had required VA to provide supportive housing on the

Campus, the Act could require VA to satisfy the housing obligation on its own, rather than outsourcing it to contractors who engage in discrimination, if it could not find contractors willing to perform the function without engaging in discrimination. But Congress has not directed VA to construct, maintain, and operate supportive housing on the Campus. Congress has simply given VA the option of leasing Campus property to developers for the purpose of their "providing supportive housing." Leasing Act § 2(a)-(b), 130 Stat. at 926. That is for good reason: VA "has no experience in building housing," whereas developers have extensive expertise in financing, constructing, and operating housing. 19-ER-4847; *see* 19-ER-4960–4964. Thus, even if the Rehabilitation Act could justify an order forbidding VA from leasing Campus land to developers, it cannot justify a requirement that VA undertake on its own the function that would otherwise have been performed by the developers.

### D. The District Court Erred In Granting Relief That Would Fundamentally Alter VA's Programs

As the Supreme Court explained in *Alexander v. Choate*, 469 U.S. 287 (1985), "[a]ny interpretation of § 504 must … be responsive to two powerful but countervailing considerations—the need to give effect to the statutory

objectives and the desire to keep § 504 within manageable bounds." *Id.* at 299. Given the latter objective, the Court explained, "a 'fundamental alteration in the nature of a program'" is "far more than the reasonable modifications" that § 504 requires. *Id.* at 300. And in the *Olmstead* context, this Court and the Supreme Court have likewise recognized that the government "must enjoy a certain measure of leeway 'to administer services with an even hand' among its citizenry," rather than being compelled to focus limited resources on a certain population to the harm of "'others with mental disabilities.'" *Townsend*, 328 F.3d at 519-520 (quoting *Olmstead*, 527 U.S. at 605, 607). "[C]ourts evaluating fundamental alteration defenses" therefore "must take into account financial and other logistical limitations on a" public entity's "capacity to provide integrated services to the disabled." *Id.* at 519.

The district court's order for VA to construct extensive on-Campus housing—1,800 units of permanent supportive housing beyond those contemplated by the Master Plan, plus 750 temporary units—contravenes these principles. It would fundamentally alter VA's approach to housing Veterans in the Los Angeles area, undermining VA's ability to serve that community, including its many members with disabilities, in the way VA thinks is best.

- 48 -

VAGLAHS's Deputy Medical Director, John Kuhn—who has vast experience supporting homeless Veterans at VA and elsewhere, *see, e.g.*, 12-ER-2635–2639—explained that VA strives to provide Veterans not just with one type of housing in one location but with a range of housing options in various locations, to accommodate their diverse needs and preferences. 12-ER-2719–2720; *see* 27-ER-6996 (HUD-VASH program prioritizes "[s]cattered site housing" and "[c]lient choice and self-determination"). VA believes that Veterans who are "'placed' in a setting that does not meet their needs or preferences … are not likely to succeed," 27-ER-7002, and that Veterans must be "integrated into the community," 12-ER-2737; *see* 27-ER-7003.

But the district court's order would impose exorbitant costs on VA, forcing it to focus its scarce resources on providing a single type of housing in a single location for Veterans with particular disabilities. 12-ER-2720–2721. That would harm the community of Veterans that VA serves, including those with disabilities. It would create an expectation that Veterans with serious mental illnesses or traumatic brain injuries should be housed on the Campus, limiting their ability to choose among other appropriate settings. 12-ER-2720. And by concentrating them on the Campus, it would undermine their integration into the broader community. 12-ER-2734–2737.

The district court barely considered VA's evidence on this point. In a few sentences, it appeared to cast doubt on whether building additional on-Campus housing would require VA to cut spending on other housing programs. The court opined that a $100 million price tag for temporary housing was "not unreasonable in the light of the VA's overall annual budget of approximately $407 billion" and that the "costs of permanent supportive housing [were] not unreasonable" because they would "be spread out over" six years" under the terms of the injunction. 1-ER-84–85. But that analysis misunderstands Rehabilitation Act doctrine and budget realities.

As to the doctrine, the relevant question is not whether the cost of an accommodation is in some abstract sense "reasonable"; it is whether the accommodation will require a fundamental alteration to the program, whether because of its cost or otherwise. As noted above, it is well established that "courts evaluating fundamental alteration defenses must take into account financial … limitations," as well as other limitations, on the government's "capacity to provide integrated services to the disabled." *Townsend*, 328 F.3d at 519. Courts cannot simply assume the availability of additional funds and opine on whether the hypothetical amount of additional funds would be "unreasonable" in the abstract.

And as to budget realities, the district court was seriously mistaken to the extent it believed VA could absorb hundreds of millions of dollars in additional housing costs without diverting resources from elsewhere. VA's budget is barely sufficient to fund its programs, including benefits for millions of Veterans and the salaries of nearly half a million employees at hundreds of medical facilities, benefits offices, and cemeteries nationwide. And as discussed above (at 9, 46–47), the Leasing Act makes clear that Congress did not expect VA to pay for the construction of on-Campus housing; rather, it authorized VA to lease land to developers who would finance the housing. In ordering VA to construct such a massive quantity of permanent supportive housing regardless of its ability to find developers willing to finance the projects, 1-ER-89–90—and to construct temporary housing that cannot be developer-financed—the district court appears to have assumed the availability of funding that Congress did not provide.

Aside from its broader distortion of VA's housing strategy, the district court's order would cause the Campus to become less hospitable for Veterans with disabilities who reside there. Mr. Kuhn testified that no "reputable provider of services … would" think it is "a good idea" to "cluster[]" several thousand supportive housing units "in one area," including because such a

large concentration of people with significant mental-health needs would likely result in "an alarming number of behavioral health incidents," "frequent mental health crises," and "widespread substance abuse disorders." 12-ER-2733. Such a community would not be "safe," Mr. Kuhn testified, unless it were made "to look like an armed camp." *Id.* The district court's order would thus "recreate an environment that … many veterans are trying to get away from, where they are going to be traumatized, where they are not going to feel safe, [and] where they are going to be fearful." *Id.*

Aside from dismissing the costs it was imposing, the district court's only response to VA's fundamental-alteration defense was to state that because VA "already administer[s] the creation of housing on and near" the Campus, "[i]ncreasing the quantity and speed at which housing is provided to veterans with disabilities is not a fundamental alteration of [its] program." 1-ER-84. But that response misses the point. It seems to assume VA's objection is to the construction of *any* housing on or near the Campus. But VA's Master Plan for the Campus already provides for the construction of 1,200 units of supportive housing. Nor is the "speed" of construction the main concern; VA has every interest in fulfilling the Master Plan as soon as practicable. Rather, as discussed above, the problem is that "[i]ncreasing the

quantity" of housing on Campus would harm Veterans with disabilities and VA's programs for them, both by altering the nature of the Campus community and by limiting other housing options.

## IV. The District Court Erred In Its Charitable-Trust Ruling

The district court equally erred in holding that VA incurred enforceable trust obligations under the 1888 deed for the Campus.

### A.    Plaintiffs Lack Standing To Assert Their Trust Claims

As an initial matter, plaintiffs lack standing to enforce the asserted trust. The "general rule" is that "no private citizen can sue to enforce a charitable trust merely on the ground that he believes he is within the class to be benefited by the trust[.]" Bogert et al., *Bogert's The Law of Trusts and Trustees* (*Bogert's*) § 414 (Westlaw, updated July 2024); *see Restatement (Third) of Trusts* § 94 cmt. g (2012). The beneficiary of a charitable trust is the public, not "the particular human beings" who are the "conduits of [the trust's] social benefits to the public." *Bogert's* § 363. For that reason, the Attorney General of the jurisdiction under whose law a charitable trust is created—the legal representative of the public—is generally the proper plaintiff to enforce the trust obligation. *Id.* § 411; *see Restatement (Third) of Trusts* § 94(2). Although this rule originates in the common law, it has constitutional significance because

Article III jurisdiction is limited to the sorts of particularized "harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021); *see also Pinkert v. Schwab Charitable Fund*, 48 F.4th 1051, 1058 (9th Cir. 2022) (Bress, J., concurring in part and in the judgment) ("[a]lthough the common law did not always use the modern terminology of Article III standing," a common-law rule related to the one here was "grounded in [a] basic Article III insight").

Some courts have recognized an exception to this rule where the "class of potential beneficiaries" of a charitable trust "is 'sharply defined' and 'limited in number.'" *He Depu v. Yahoo! Inc.*, 950 F.3d 897, 906 (D.C. Cir. 2020) (discussing D.C. law); *see Restatement (Third) of Trusts* § 94 cmt. g(1) ("reasonably limited"). But any such exception is not satisfied here. Any trust created by the 1888 deed would benefit a vast, ill-defined population—roughly speaking, all Veterans in the Western United States. It is irrelevant that the plaintiff class here is more limited and better defined; what matters is the scope and definition of the class of beneficiaries of the asserted trust.

**B.    The 1888 Deed Did Not Establish A Trust Enforceable Against The Government**

Even if the district court had jurisdiction, it erred in concluding that the deed created a judicially enforceable charitable trust.

1.    Like all trusts, a charitable trust is created only if "a testator or other transferor manifests an intention to impose enforceable duties on the transferee." *Restatement (Third) of Trusts* § 13 cmt. d.  Statements of purpose that "merely … explain the motivation for a bequest" do not create a charitable trust.  *Id.*  And although it "is sometimes" unclear "[w]hether a transferor intended to impose the obligations essential to a trust" or merely "to express a nonbinding wish or recommendation," the default rule is to construe "precatory language accompanying a transfer" as leaving the transferee free "to decide whether or not to follow the suggestion."  *Id.*

The district court held that the Campus deed created a trust obligating the government to use the Campus in perpetuity for the purposes specified in the deed.  1-ER-195–200.  But the deed's language does not "manifest[] an intention to impose" that duty, *Restatement (Third) of Trusts* § 13 cmt. d; it merely explains the donors' motivations.  The relevant language is as follows:

WITNESSETH: That whereas by an act of Congress … to provide for the location and erection of a branch home for disabled volunteer soldiers West of the Rocky Mountains, the Board of Managers of the National Home for Disabled Volunteer Soldiers, were authorized, empowered and directed to locate, establish, construct and permanently maintain a branch of said National Home … at such place in the States West of the Rocky Mountains as to said Board should appear most desirable and advantageous.

And whereas, [the donors] in consideration that [the government] should locate, establish, construct and permanently maintain a branch of said National Home … offered to donate to [the government] three hundred acres of land … on which to locate, establish, construct and permanently maintain such branch of said National Home … :

Now therefore, in consideration of the premises and of the location, establishment, construction and permanent maintenance of a branch of said National Home … on such tract of land … [the donors] have given and granted … the following described land and premises … for the purpose of such branch Home … to be thereon so located, established, constructed and permanently maintained.

*Farquhar v. United States*, 1990 WL 121076, at *1-2 (9th Cir. Aug. 21, 1990) (unpublished) (quoting the deed with stylistic alterations); *see* 7-ER-1439 (deed).  The first paragraph explains that Congress directed the construction of a Veterans' home at a place to be determined, and the second and third paragraphs explain that the donors were providing land for the purpose of allowing the home to be constructed on that land.  This language shows that

- 56 -

the donors hoped that their gift would be used in perpetuity to support Veterans, but it does not bind the government to do so.

This Court made that clear in *Farquhar*, which involved this very deed. That case addressed the ownership of a two-acre parcel of the original Campus that the government had declared "to be surplus property," and sold to a private company, after it "was sliced off from what remained of the original" Campus by the San Diego Freeway. 1990 WL 121076, at *1. The plaintiffs claimed that the land "reverted to them," and thus could not be sold to the company, because the deed created "a condition subsequent" under which the government would lose any part of the Campus that it no longer used for the purposes specified in the deed. *Id.* This Court disagreed, explaining that "the language of the 1888 deed" is properly understood "as creating a covenant or statement of purpose" for the land "rather than a condition" on its use. *Id.* at *3. Although the Court did not address a charitable-trust theory, its reasoning makes clear that it did not regard the deed as binding the government to perpetual obligations.

The California Court of Appeal has likewise rejected an argument that a nearly identical deed created a charitable trust. In *Fletcher v. City of San Diego*, 2002 WL 31480258 (Cal. Ct. App. Nov. 7, 2002) (unpublished), the

court addressed a 1921 deed "conveying 135 acres on San Diego Bay" to the federal government "'for the exclusive use of the United States Navy Department as a site for a Naval Training Station.'" *Id.* at *1. After the government closed the training center it had long operated on the property, and the property was sold to a developer, one of the donors' heirs sued the government for breach of trust. But the court held that the deed language "merely established the grantors' purpose for making the gift (i.e., that the Navy would establish a naval training station on the site); it did not establish with reasonable certainty that the grantors intended to impose an imperative obligation on the government to maintain the property as a naval training station in perpetuity." *Id.* at *3.

To be clear, the terms by which donors conveyed land in these cases may well have imposed a binding obligation with respect to the *initial* use of the land. That is why the government's acceptance of these deeds required congressional authorization. *See Story v. Snyder*, 184 F.2d 454, 456 (D.C. Cir. 1950) ("[G]ifts to the United States which involve any duty, burden, or condition, or are made dependent upon some future performance by the United States, are not accepted by the Government unless by the express authority of Congress."). The government could not accept a donation of land for the

purpose of constructing a Veterans' home or naval training center and then immediately use the land for a different purpose.

But in holding that the deeds did not impose perpetual trust obligations, *Farquhar* and *Fletcher* recognize a significant distinction between the government's initial use of donated land and its use of the same land decades later.  As the Court explained in *Farquhar*, the government's binding obligation with respect to the use of the Campus was fully satisfied—*i.e.*, "the grantors" of the Campus "received the benefit they sought by donating" it—when "[a] branch home for veterans was constructed on the property," 1990 WL 121076, at *3, even though the government much later sold a piece of the land that had not been used for the home.  The court in *Fletcher* likewise explained that the government could not be compelled to "maintain the property as a naval training station in perpetuity."  2002 WL 31480258, at *3. A contrary rule, binding the government to perpetual trust obligations under deeds that simply express the donors' purpose, would give private donors extraordinary power to dictate government operations even decades or centuries after their gifts.

2.    Even if the 1888 deed created a charitable trust, that is insufficient to make any associated duties judicially enforceable against the

government.  Fiduciary duties are judicially enforceable against the government only when the government unambiguously assumes them and authorizes their enforcement.  *See, e.g.*, *Arizona v. Navajo Nation*, 599 U.S. 555, 564 (2023) (government owes enforceable duties to an Indian Tribe only if "'it expressly accepts those responsibilities'" through "'specific rights-creating or duty-imposing' language in a treaty, statute, or regulation"); *Restatement (Second) of Trusts* § 95 (1959) ("The United States or a State has capacity to take and hold property in trust, but in the absence of a statute otherwise providing the trust is unenforceable against the United States or a State.").

In *Valentini*, the district court concluded that the 1888 deed created a trust but recognized that Congress had not provided for judicial enforcement.  *Valentini I*, 860 F. Supp. 2d at 1103-1111.  Here, the district court held that Congress later provided for enforcement by enacting the Leasing Act and the Campus Improvement Act.  1-ER-198–199.  The court reasoned that "the statutory obligations" imposed by those Acts "mirror the types of fiduciary duties that trustees traditionally assume."  1-ER-199.

But even if the Leasing and Campus Improvement Acts had accepted all the trust duties supposedly created by the deed—rather than just the narrower set of restrictions specified in the Acts themselves—they did not

- 60 -

provide for those duties to be judicially enforceable. There is a sharp distinction between situations where "Congress has been content to provide that the accepting and administering officials shall observe the terms and conditions of [a] gift" and those where "it has gone farther, and provided means whereby the donor can through court action compel the administering official or agency to observe the terms and conditions of an accepted gift." *Story*, 184 F.2d at 456. Here, Congress plainly did not do the latter.

To the contrary, the Leasing Act provides for administrative and political rather than judicial remedies. In the section addressing compliance, it charges VA's Inspector General with determining whether VA is "in compliance with all Federal laws relating to leases and land use at the Campus." Leasing Act § 2(h)(1), 130 Stat. at 928; *see id.* § 2(j)(3), 130 Stat. at 929-930 (requiring submission of Inspector General reports to Congress). And if the Inspector General finds noncompliance or "significant mismanagement," the Act specifies a political, not a judicial, remedy: VA "may not enter into any lease or land-sharing agreement at the Campus, or renew any" noncompliant lease or agreement, "until the Secretary certifies" to four congressional committees, as well as every Member of Congress "who represents the area in which the Campus is located[,] that all recommendations included in the

[Inspector General's] audit report or evaluation have been implemented." *Id.* § 2(h)(1), 130 Stat. at 928. The Act also facilitates congressional oversight by requiring VA to notify the same congressional committees and Members of "each lease or land-sharing agreement intended to be entered into or renewed at the Campus, … not later than 45 days before entering into or renewing the lease or land-sharing agreement," and requiring VA to provide annual reports "evaluating all leases and land-sharing agreements carried out at the Campus." *Id.* § 2(j)(1), (2), 130 Stat. at 929. Neither the Leasing Act nor the Campus Improvement Act says anything about a judicial remedy.

The absence of such language in the Leasing and Campus Improvement Acts contrasts with its presence in a different provision that the *Valentini* court identified as providing for enforcement of trust duties against the federal government. 860 F. Supp. 2d at 1107. That provision, 2 U.S.C. § 159, expressly states that the Library of Congress Trust Fund Board "may be sued in the United States District Court for the District of Columbia … for the purpose of enforcing the provisions of any trust accepted by it." There is nothing remotely like that here, and thus no basis to conclude that any trust duties imposed by the 1888 deed are judicially enforceable.

## V.    The District Court's Land-Use Injunctions Exceeded Its Authority

The district court also concluded that three of VA's land-use agreements for the Campus—with Brentwood School, Safety Park, and Bridgeland—were invalid under the APA.  1-ER-115–117.  The government does not challenge that part of the judgment (though the invalidation of the UCLA lease should be reversed because it rested solely on a charitable-trust theory, 1-ER-112–115; 1-ER-115 n.14).

But the district court did not merely hold the agreements invalid and "void" them, 1-ER-117.  It took the significant additional step of enjoining VA "from entering into new leases with" the entities in question, reasoning that VA had "persistent[ly]" made "unlawful leasing decisions" and that "any renegotiation of" the leases in question "would be futile."  1-ER-118.  The court then held a series of hearings where it encouraged what it characterized as settlements with respect to the land-use agreements, in part by threatening, and in some cases imposing, severe consequences on the land users in an apparent effort to induce them to make concessions.  *See supra* p. 16.  And the court ordered the government to enter into a new lease with Brentwood on terms agreed upon by plaintiffs and Brentwood—terms

providing for ongoing judicial oversight over VA's use of revenue from the lease.  1-ER-33–37.

Those actions exceeded the court's authority for several reasons.  First, they went well beyond remedying any injury to plaintiffs.  Because a federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 585 U.S. 48, 72-73 (2018).  Equitable principles reinforce that constitutional limit: Injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Here, to the extent the agreements in question injured plaintiffs by violating the Leasing Act, those injuries would be fully remedied by holding the agreements invalid and leaving VA free to renegotiate them.

Second, the court exceeded its statutory authority under the APA.  "Unlike a district court managing a garden variety civil suit, a district court reviewing a final agency action does not perform its normal role but instead sits as an appellate tribunal."  *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (quotation marks omitted); *see, e.g.*, *County of Fresno v. Azar*, 384 F. Supp. 3d 1164, 1172 (E.D. Cal. 2019) (quoting the D.C. Circuit's

characterization); *S.A. v. Trump*, 363 F. Supp. 3d 1048, 1075 (N.D. Cal. 2018) (same). And just as an appellate court's role in reviewing a district-court judgment is to affirm, reverse, or vacate it—not to fashion new equitable decrees—a district court's role in reviewing agency action is generally limited to determining whether the agency acted lawfully and holding its action invalid if it did not. "[U]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards." *Palisades*, 426 F.3d at 403 (quotation marks omitted); *see Maine Med. Ctr. v. Burwell*, 841 F.3d 10, 16 (1st Cir. 2016) (invoking this principle).

District courts possess equitable power in APA actions, but it is limited to effectuating their statutory powers. Thus, for example, when this Court spoke in *Northwest Environmental Defense Center v. Bonneville Power Administration* of the federal courts' "broad powers" as "court[s] of equity conducting judicial review under the APA," it was referring to the courts' ability to order an agency that had unlawfully stopped doing something to continue doing it. 477 F.3d 668, 680-681 (9th Cir. 2007). A court can likewise enjoin the enforcement of an unlawful agency action to the extent necessary to

prevent harm to the plaintiff; doing so effectuates the court's power to hold the action unlawful.  Here, once the district court held the agreements invalid, it could perhaps have enjoined VA against reentering agreements on the terms the court had held were unlawful.  But the court could not enjoin VA against entering *any* future agreements with the entities in question, regardless of the terms, any more than a court that invalidates an agency's rule can enjoin the agency against issuing any rule on the same subject in the future.

The district court's assertion that VA had "persistent[ly]" made "unlawful leasing decisions" in the past, 1-ER-118, is irrelevant even assuming it is accurate.  Consider again the example of a court holding invalid an agency rule:  The fact that courts had invalidated similar rules in the past would not justify an injunction barring the agency from trying again.  Such an injunction would improperly intrude into the functioning of the Executive Branch.  Here, even if there were reason to believe VA might enter into unlawful agreements in the future, the validity of such agreements would need to be adjudicated in future APA actions, not preemptively adjudicated here.  And in any event, the district court's assertion that "renegotiation … would be futile," *id.*, was undercut by the court's subsequent determination

that a new version of the Brentwood lease, agreed upon by Brentwood and plaintiffs, would comply with the applicable statutes.

Finally, the district court's order requiring VA to enter into that new lease with Brentwood violated the basic precept that the government possess an "unrestricted power … to determine those with whom it will deal," *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). VA has no desire to evict Brentwood; it has every intention of entering into a new lease with Brentwood that provides additional benefits to Veterans and their families. But the court could not compel it to do that.

These errors pervaded the district court's post-judgment proceedings, reflecting the court's basic misunderstanding of its role. The task of adjudicating plaintiffs' APA challenge to the land-use agreements was complete when the court held the agreements invalid. At that point, there was no remaining claim to be "settled." The protracted series of post-judgment hearings, at which the district court sought to pressure the government and the land users into entering into new agreements on terms the court found preferable, had nothing to do with "settling" any claims; rather, they reflected the court's overly expansive understanding of its powers to superintend government operations.

# CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

E. MARTIN ESTRADA
*United States Attorney*

CATHERINE M.A. CARROLL
*Deputy Assistant Attorney General*

CHARLES W. SCARBOROUGH

*/s/ Daniel Winik*
DANIEL WINIK
AMANDA L. MUNDELL
*Attorneys, Appellate Staff*
*Civil Division, Room 7245*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8849*
*daniel.l.winik@usdoj.gov*

- 68 -

## STATEMENT OF RELATED CASES

This case is related to the four other appeals that have been filed in the same case: Nos. 24-6338, -6578, -6603, and -6888.  The motions panel directed that these appeals be calendared together for April 2025.

*/s/ Daniel Winik*
Daniel Winik

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** <u>No. 24-6576</u>

      I am the attorney or self-represented party.

      **This brief contains** <u>13,975</u> **words,** excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

      I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>/s/ *Daniel Winik*</u>      **Date** <u>January 17, 2025</u>